**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1435
_____

JOSH FINKELMAN; BEN HOCH-PARKER
On Behalf of Themselves and the Putative Class,

Appellants

v.

NATIONAL FOOTBALL LEAGUE;
NFL VENTURES, L.P.;
NFL PROPERTIES, LLC; NFL VENTURES, INC.;
NFL ENTERPRISES LLC
_____

On Appeal from the District Court
for the District of New Jersey
(Civil No. 3-14-cv-00096)
District Judge:  Honorable Peter G. Sheridan
_____

Argued October 8, 2015

Before:  FUENTES, SMITH, and BARRY, *Circuit Judges*

(Opinion Filed: January 14, 2016)

Bruce H. Nagel, Esq. **[ARGUED]**
Robert H. Solomon, Esq.
Greg M. Kohn, Esq.
Andrew Pepper, Esq.
Nagel Rice, LLP
103 Eisenhower Parkway
Roseland, NJ  07069

*Attorneys for Appellants*

Jonathan D. Pressment, Esq. **[ARGUED]**
William Feldman, Esq.
Haynes & Boone, LLP
30 Rockefeller Center, 26th Floor
New York, NY  10112

Karen A. Confoy, Esq.
Steven J. Daroci, Esq.
Fox Rothschild LLP
997 Lenox Drive, Building 3
Lawrenceville, NJ  08648

*Attorneys for Appellees*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*:

Many of us have felt the disappointment of wanting to attend a concert or athletic event only to discover that the event has sold out. When an artist or sports team is especially popular, the gap between the supply of tickets and the demand for those tickets can be enormous. Some people will be able to attend such an event; others will not.

The Super Bowl is perhaps the ultimate example of an event where demand for tickets exceeds supply. The two named plaintiffs in this case, Josh Finkelman and Ben Hoch-Parker, wanted to attend Super Bowl XLVIII, which was held in New Jersey in 2014. Finkelman bought two tickets on the resale market, allegedly for much more than face price. Hoch-Parker—confronted with the high prices in that market—opted not to purchase any. Plaintiffs then brought a class action against the National Football League ("NFL") and various affiliated entities in the District of New Jersey, alleging that the NFL's ticketing practices for the Super Bowl violated New Jersey law.[1] The District Court dismissed plaintiffs' suit for failure to state a claim, and plaintiffs now appeal.

We need not grapple with the meaning of New Jersey

---

[1] The other defendants include NFL Ventures, L.P., NFL Properties, LLC, NFL Ventures, Inc., and NFL Enterprises LLC. Plaintiffs initially sued another defendant, NFL on Location, but later filed a stipulation voluntarily dismissing that defendant. (*See* Appellants' Br. at 12 n.5.) We will refer to the defendants collectively as "the NFL."

law in order to resolve this case. Our inquiry is more basic. Just as the realities of supply and demand mean that not everyone who wants to attend a popular event will be able to do so, federal courts, too, are not open to everyone who might want to litigate in them. Our courts are courts of limited subject matter jurisdiction, empowered by Article III of the Constitution to hear only "cases" and "controversies." Over time, those words have come to signify certain minimum requirements that are necessary to establish constitutional standing. These requirements are unyielding. Plaintiffs who are able to establish them will be able to sue in federal courts; others will not.

We conclude that neither Hoch-Parker nor Finkelman has constitutional standing to bring this case. Were we to decide otherwise, anyone who purchased a Super Bowl ticket on the resale market would have standing to sue in federal court based on nothing more than conjectural assertions of causation and injury. Article III requires more.

## I. Background

Plaintiffs rely on a rarely litigated New Jersey statute, N.J. Stat. Ann. § 56:8-35.1 (the "Ticket Law"), which appears in New Jersey's Consumer Fraud Act. It says:

> It shall be an unlawful practice for a person, who has access to tickets to an event prior to the tickets' release for sale to the general public, to withhold those tickets from sale to the general public in an amount exceeding 5% of all available seating for the event.

4

The Consumer Fraud Act permits private plaintiffs to sue any person who violates the Act and causes them to suffer ascertainable damages.[2] Plaintiffs assert that the NFL's method of selling tickets to Super Bowl XLVIII violated the Ticket Law and resulted in unjust enrichment.

The New Jersey Legislature passed the Ticket Law in 2002 as part of an effort to reform its statutes regulating ticket resale, more commonly known as "scalping." New Jersey has regulated ticket resale since at least 1983.[3] In the late 1990s, there was an effort to reexamine the effectiveness of these laws, leading to the creation of a gubernatorial Ticket Brokering Study Commission.[4] Its mission was to "compare the impact of a regulated and deregulated ticket resale market on the cost and availability of tickets to New Jersey entertainment events" and to consider various proposed

---

[2] N.J. Stat. Ann. § 56:8–19. As originally drafted, the Act empowered only the New Jersey Attorney General to sue to enforce its provisions. The Legislature amended the statute in 1971 to permit private suits, but required private plaintiffs (unlike the Attorney General) to prove that they suffered an ascertainable loss caused by a defendant's misconduct. *See Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 747–48 (N.J. 2009).

[3] J.A. Vol. II at 203–04, 208–09 (N.J. Dep't of L. & Pub. Safety, Div. of Consumer Affairs, Report to Governor Christine Todd Whitman on Access to Entertainment in New Jersey (Apr. 7, 1997)).

[4] J.A. Vol. II at 171–200 (Ticket Brokering Study Comm'n, Ticket Broker Report (Oct. 31, 2001)).

reforms.[5]

The Commission heard two days of testimony from a dozen witnesses before publishing its final report in October 2001. It found that, "[i]n a typical year, 90% to 95% of events in New Jersey do not sell out," but getting tickets to the "premium events" that do sell out "is not easy."[6] The Commission focused heavily on "hold-backs" of tickets by event organizers, concluding that "[h]old-backs disproportionately affect the general public's opportunity to obtain tickets in favor of privileged insiders," and that the practice should be "eliminated or limited by statute or regulation."[7] The Commission therefore recommended new legislation to "[l]imit the number of tickets which can be held back from sale to the general public to 5 percent of the available seating in any venue or performance."[8] The Legislature took up the Commission's suggestion, and Governor Whitman signed the bill enacting the Ticket Law on January 8, 2002.[9]

Since the Ticket Law's passage, very few courts have grappled with its meaning. Indeed, the parties point to only one case in which a New Jersey state court has interpreted the

---

[5] *Id.* at 173.

[6] *Id.* at 175.

[7] *Id.* at 197.

[8] *Id.* at 191.

[9] 2001 N.J. Laws 394.

Law.[10]

### A. Factual Allegations

Super Bowl XLVIII took place at MetLife Stadium in East Rutherford, New Jersey on February 2, 2014.[11] Plaintiffs allege that the NFL distributed 99% of Super Bowl tickets to NFL teams and League insiders.[12] Of that amount, 75% of tickets allegedly went to teams, with 5% going to the host team, 17.5% going to each team playing in the Super Bowl, and 35% going to the remaining teams in the League. The remaining 25% of tickets are said to have been distributed to "companies, broadcast networks, media sponsors, the host committee and other league insiders."[13] Only about 1% of Super Bowl tickets were available for purchase by members of the general public, and the only way for someone to obtain one of *those* tickets was to participate in a League-sponsored lottery.[14] In order to acquire a ticket in the lottery, a person

---

[10] *Harvey v. GSAC Partners, Inc.*, No. L-736-03 (N.J. Super. Ct. Law Div., Monmouth Cnty. Mar. 21, 2003). *See* J.A. Vol. II at 155–65 (a copy of the *Harvey* opinion).

[11] First. Am. Compl. (J.A. Vol. II at 76–92) ¶ 17. In resolving an appeal from the grant of a motion to dismiss, we accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiffs' favor. *Hansler v. Lehigh Valley Hosp. Network*, 798 F.3d 149, 152 n.2 (3d Cir. 2015).

[12] First Am. Compl. ¶ 18.

[13] *Id.* ¶¶ 18–19.

[14] *Id.* ¶¶ 1, 18.

had to (i) enter by the deadline, (ii) be selected as a winner, and (iii) choose to actually purchase a ticket.[15]

Neither Hoch-Parker nor Finkelman entered the NFL's ticket lottery. Instead, on December 30, 2013, Finkelman purchased two tickets to the Super Bowl in the resale market at a price of $2,000 per ticket (which he alleges was well in excess of the tickets' $800 face price).[16] Hoch-Parker wanted to purchase five Super Bowl tickets for himself and his family, hoping to pay no more than $1,000 per ticket.[17] He decided not to purchase any when, after researching the availability of tickets between November and December of 2013, the only tickets he could find were for $4,200 (or more).[18]

## B.    Procedural History in the District Court

Finkelman filed a putative class action against the NFL in January 2014 in the District of New Jersey. One month later, he filed an amended complaint that added several

---

[15] Appellees' Br. at 34 n.13.

[16] First. Am. Compl. ¶¶ 31–32. The $800 figure appears on page 11 of appellants' opening brief. As the NFL points out, the First Amended Complaint does not actually allege the face price of tickets to Super Bowl XLVIII. (Appellees' Br. at 11 n.2.)

[17] First. Am. Compl. ¶¶ 33–34.

[18] *Id.* ¶¶ 34–35. The First Amended Complaint states that Hoch-Parker searched for tickets in 2012, but this is clearly a scrivener's error.

defendants and identified Hoch-Parker as a second named plaintiff.

The District Court granted the NFL's motion to dismiss the complaint—with prejudice—on January 20, 2015, in an oral decision read into the record.[19] Four aspects of its decision merit further discussion here.

*First*, the District Court concluded that plaintiffs failed to plead a viable claim under the Ticket Law. It reasoned that the NFL did not "withhold" any tickets to the Super Bowl within the meaning of the Law, but rather "distributed or allocated [all tickets] according to [its] existing system."[20] It also determined that the Ticket Law's 5% limitation on withholding tickets "applies solely to tickets that are intended for release to the general public."[21] At most, that portion was the 1% of tickets sold through the NFL's lottery—and none of those tickets were withheld.[22] Consequently, the District Court decided that the NFL's ticketing practices did not run afoul of the Ticket Law.

*Second*, the District Court concluded that Finkelman failed to plead causation under the New Jersey Consumer Fraud Act. It reasoned that Finkelman's decision not to enter

---

[19] *See* J.A. Vol. I at 31–41. The District Court entered an order granting the NFL's motion to dismiss on January 21, 2015. *Id.* at 3.

[20] *Id.* at 38:2–4.

[21] *Id.* at 38:5–7.

[22] *Id.* at 38:23–39:3.

9

the NFL's ticket lottery precluded him from proving causation because he could not demonstrate that he suffered any injury resulting from the NFL's alleged misconduct.[23] The District Court stated that it would be "unreasonable" for Finkelman to recover under the Act because he "failed to avail himself of the very mechanism . . . whereby his harm would have been avoided"—*i.e.*, entering the lottery and possibly winning a face-price ticket.[24] The District Court viewed the causation issue as a fatal pleading defect under the state statute, although it noted that Finkelman's failure to enter the NFL ticket lottery raised "clear standing issues" under Article III.[25]

Moreover, the District Court was skeptical that Finkelman would be able to show causation even if he had entered the lottery *and lost*. It noted that the tickets Finkelman purchased on the secondary market might well have been sold to him by a lottery winner who purchased them at face price. The District Court stated that, if this were true, it would be "hard to discern any wrongdoing on the part of the NFL that could have served as a cause of harm of which Finkelman now complains."[26]

*Third*, the District Court concluded that Hoch-Parker

---

[23] *Id.* at 39:19–22.

[24] *Id.* at 39:22–25.

[25] *Id.* at 36:9–13.

[26] *Id.* at 40:15–18. On appeal, Finkelman asserts that this scenario is impossible because the NFL requires lottery winners to pick up their tickets in person. (Appellants' Br. at 17 & n.8.)

10

lacked Article III standing.  In its view, having chosen not to purchase any Super Bowl tickets, Hoch-Parker could not show that he suffered any harm "beyond pure speculation or the merely hypothetical."[27]

*Fourth*, the District Court dismissed plaintiffs' unjust enrichment claim.  It reasoned that, as a quasi-contractual remedy, unjust enrichment requires a "sufficiently direct relationship" between the alleged wrongdoer and the plaintiff.[28]  Here, by contrast, the relationship between the plaintiffs and the NFL was "too ambiguous, remote or attenuated" for plaintiffs' unjust enrichment claim to be viable.[29]

## II.     Appellate Jurisdiction and Standard of Review

This is a diversity suit brought by plaintiffs under the Class Action Fairness Act.[30]  This Court has appellate jurisdiction over the final judgment of the District Court

---

[27] J.A. Vol. I at 35:21–23.

[28] *Id.* at 41:8–11.

[29] *Id.* at 41:12–16.

[30] 28 U.S.C. § 1332(d)(2)(A).

under 28 U.S.C. § 1291.[31]  The District Court entered an order dismissing the case on January 21, 2015, and plaintiffs filed a notice of appeal on February 13, 2015.[32]

The Court's review of a decision dismissing a complaint is plenary.[33]

## III.  Article III Standing

The question we confront is whether plaintiffs have alleged facts which, if true, would be sufficient to establish Article III standing.

We begin by noting that our inquiry is more searching than the one originally contemplated by the parties.  In its principal brief, the NFL asked this Court to affirm the District Court's dismissal of Hoch-Parker's claims on standing grounds, but, with respect to Finkelman, focused exclusively

---

[31] Of course, notwithstanding the presence of statutory appellate jurisdiction, our conclusion that the named plaintiffs lack Article III standing means that we do not have subject matter jurisdiction to reach the merits of plaintiffs' claims. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998) ("For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires.").

[32] J.A. Vol. I at 1–2.

[33] *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 452 (3d Cir. 2006).

on the viability of plaintiffs' claim under the Ticket Law. In litigating the appeal this way, the NFL was following the lead of the District Court, which concluded that Finkelman failed to allege causation under the New Jersey Consumer Fraud Act. In doing so, the District Court noted that Finkelman's failure to enter the NFL ticket lottery raised "certain standing issues," but decided "the issue [was] more properly examined" in the context of New Jersey law "as opposed to standing."[34]

We must take a different approach. A federal court's obligation to assure itself that it has subject matter jurisdiction over a claim is antecedent to its power to reach the merits of that claim.[35] To that end, even when appellees do not address standing, we must determine on our own whether standing exists.[36] Cognizant of our "bedrock obligation to examine [our] own subject matter jurisdiction," we therefore asked the parties to submit supplemental briefs addressing standing.[37]

### A. The Minimum Requirements of Article III Standing

To establish Article III standing, a plaintiff must demonstrate "(1) an injury-in-fact, (2) a sufficient causal

---

[34] J.A. Vol. I at 36:2–13.

[35] *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007).

[36] *Steele v. Blackman*, 236 F.3d 130, 134 n.4 (3d Cir. 2001).

[37] *Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997).

connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."[38]

To allege the first element, injury-in-fact, a plaintiff must claim "the invasion of a concrete and particularized legally protected interest" resulting in harm "that is actual or imminent, not conjectural or hypothetical."[39]   To be "concrete," an injury must be "real, or distinct and palpable, as opposed to merely abstract."[40]   To be sufficiently "particularized," an injury must "affect the plaintiff in a personal and individual way."[41]   Plaintiffs do not allege an injury-in-fact when they rely on a "chain of contingencies" or "mere speculation."[42]

---

[38] *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 358–59 (3d Cir. 2015) (internal quotation marks omitted and punctuation modified) (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014)).

[39] *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)), *cert. denied*, 135 S. Ct. 1738 (2015).

[40] *N.J. Physicians, Inc. v. President of the United States*, 653 F.3d 234, 238 (3d Cir. 2011) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983), and *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

[41] *Defenders of Wildlife*, 504 U.S. at 560 n.1.

[42] *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 364 (3d Cir. 2014) (quoting *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148 (2013)).

The second element of Article III standing is causation. This element requires the alleged injury to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."[43] This requirement is "akin to 'but for' causation" in tort and may be satisfied "even where the conduct in question might not have been a proximate cause of the harm."[44] An "indirect causal relationship will suffice," provided that "there is a 'fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant.'"[45]

Finally, the plaintiff must establish redressability. This requires the plaintiff to show that it is "likely, as opposed to merely speculative," that the alleged injury will be redressed by a favorable decision.[46]

The burden to establish standing rests with the plaintiffs.[47] The manner in which plaintiffs go about

---

[43] *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 137–38 (3d Cir. 2009) (quoting *Defenders of Wildlife*, 504 U.S. at 560).

[44] *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (3d Cir. 2013) (citing *The Pitt News v. Fisher*, 215 F.3d 354, 360–61 (3d Cir. 2000)).

[45] *Toll Bros.*, 555 F.3d at 142 (quoting *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)).

[46] *Defenders of Wildlife*, 504 U.S. at 561 (internal quotation marks omitted).

[47] *Berg v. Obama*, 586 F.3d 234, 238 (3d Cir. 2009).

satisfying that burden depends on the posture of the case.  The Supreme Court has said that "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."[48]  When assessing standing on the basis of the facts alleged in a complaint, this means we apply the same standard of review we use when assessing a motion to dismiss for failure to state a claim.[49]

We have described this inquiry as a three-step process.  First, we "tak[e] note of the elements a plaintiff must plead to state a claim"—here, the three elements of Article III standing.[50]  Second, we eliminate from consideration any allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."[51]  Third, "where there are well-pleaded factual allegations, [we] assume their veracity and then determine whether they plausibly" establish the prerequisites of standing.[52]  In conducting this analysis, we are mindful of the Supreme Court's teaching that all aspects of a complaint must rest on "well-pleaded factual

---

[48] *Defenders of Wildlife*, 504 U.S. at 561.

[49] *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

[50] *Id.* (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).

[51] *Id.*

[52] *Id.*

allegations" and not "mere conclusory statements."[53] Thus, to survive a motion to dismiss for lack of standing, a plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue."[54] Speculative or conjectural assertions are not sufficient.[55]

---

[53] *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (discussing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

[54] *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).

[55] *Schering Plough*, 678 F.3d at 248 (rejecting the sufficiency of an allegation that rested on "pure conjecture").

Some of our sister circuits have questioned how well the "plausibility" standard of *Iqbal* and *Twombly* maps onto standing doctrine. *See, e.g.*, *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) ("We simply note that *Twombly* and *Iqbal* deal with a fundamentally different issue, and that the court's focus should be on the jurisprudence that deals with constitutional standing."); *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 225 (2d Cir. 2008) ("However, plausibility is not at issue at this point, as we are considering only Article III standing.").

Absent standing on the part of the named plaintiffs, we must dismiss a putative class action for lack of subject matter jurisdiction.[56]  As will become apparent, we have no choice but to do so here.

### B.  Hoch-Parker Does Not Allege an Article III Injury

The District Court concluded that Hoch-Parker lacks Article III standing because he never purchased a ticket to the Super Bowl, meaning that he suffered no out-of-pocket loss and, in the District Court's view, no injury-in-fact.  This is

---

Without wading too deeply into this particular thicket, we are content to say that, even when reviewing only the bare allegations of a complaint, *Iqbal* and *Twombly* teach that standing cannot rest on mere "legal conclusions" or "naked assertions."  *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013); *see also Maya*, 658 F.3d at 1068 (a plaintiff cannot "rely on a bare legal conclusion to assert injury-in-fact, or engage in an ingenious academic exercise in the conceivable to explain how defendants' actions caused his injury") (internal quotation marks omitted); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss.").

[56] *Neale*, 794 F.3d at 362 ("[T]he 'cases or controversies' requirement is satisfied so long as a class representative has standing.").

18

plainly correct.[57]  Injuries-in-fact must be "particularized" in the sense of "affect[ing] the plaintiff in a personal and individual way."[58]  Because Hoch-Parker never purchased a ticket on the secondary market, he suffered no more injury than any of the possibly tens of thousands of people who thought about purchasing a ticket to the Super Bowl and chose not to.  Nor does Hoch-Parker allege an "actual" injury, as opposed to one that is "conjectural or hypothetical."[59]  Because he chose not to purchase any tickets, the amount of any damages Hoch-Parker might have suffered due to the NFL's alleged misconduct is completely indeterminate.

Perhaps sensing the weakness of his claim to have suffered an injury-in-fact, Hoch-Parker tries to recast his injury as the "lost opportunity" he suffered when he was unable to attend the Super Bowl.  He cites our decision in *Howard v. New Jersey Department of Civil Service* in support of that assertion.[60]  We find this "lost opportunity" argument completely unpersuasive.  Indeed, any analogy between *Howard* and the circumstances here is, at best, extremely strained.

---

[57] Even plaintiffs' counsel "conceded" at oral argument that the question of whether Hoch-Parker has standing is a "troubling," "troublesome," and "difficult issue."  Oral Arg. Recording at 1:42, 5:35, 6:46, *available at* http://www2.ca3.uscourts.gov/oralargument/audio/15-1435Finkelmanv.NationalFootball.mp3.

[58] *Defenders of Wildlife*, 504 U.S. at 560 n.1.

[59] *Id.* at 560 (quotation marks omitted).

[60] 667 F.2d 1099 (3d Cir 1981).

19

The *Howard* plaintiffs alleged that the physical agility test then required of applicants to become police officers in Newark discriminated on the basis of sex.[61]  In assessing whether the plaintiffs had standing, the Court concluded that the alleged loss of the opportunity to obtain a job with the police force was sufficient to make out an injury-in-fact.[62]  Of course, the *Howard* plaintiffs had already entered a competitive application process that they claimed was derailed by unconstitutional conduct on the part of state actors.  Hoch-Parker, by contrast, merely "researched the availability of tickets" for the Super Bowl.[63]  He took no meaningful action to pursue the "opportunity" to attend the game at all.

Moreover, Hoch-Parker completely glosses over the *Howard* Court's actual resolution of the standing issue in that case.  Since the *Howard* plaintiffs "were refused employment because they failed the initial written examination, not because they failed the physical agility test," the Court concluded that they *lacked* standing because they could not show any "causal connection between the claimed injury (loss of job opportunity) and the challenged conduct (use of the physical agility test)."[64]  Hoch-Parker faces the same causation problem.  Demand for Super Bowl tickets was so great that Hoch-Parker might have been unable to obtain any tickets at his preferred price even if the NFL had made *all*

---

[61] *Id.* at 1100–01.

[62] *Id.* at 1101.

[63] First Am. Compl. ¶ 34.

[64] 667 F.2d at 1101.

20

tickets to the Super Bowl available to members of the general public. As in *Howard*, there is thus an insufficient connection between Hoch-Parker's claimed injury (the loss of an opportunity to attend the Super Bowl) and the challenged conduct (withholding of tickets).

Our conclusion that Hoch-Parker lacks standing is not a hard call. If the Court were to credit Hoch-Parker's concept of injury, *everyone* who contemplated buying a Super Bowl ticket but decided against it would have standing to bring a claim under the Ticket Law. Article III is simply not that expansive.[65]

---

[65] Hoch-Parker suggests that the Supreme Court may decide in *Spokeo, Inc. v. Robins* that "naked statutory violations" are sufficient to confer Article III standing and encourages us to consider the "direct application" of *Spokeo* to this case. (Appellants' Ltr. to Ct. at 6 (Sept. 29, 2015).) The Supreme Court there granted certiorari to address the question of "[w]hether Congress may confer Article III standing upon a plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of a federal statute." Supreme Court, No. 13-1339, Question Presented, http://www.supremecourt.gov/qp/13-01339qp.pdf (last visited Nov. 16, 2015). We need not wait for an opinion in *Spokeo* to decide that Hoch-Parker lacks standing.

Accordingly, we will uphold the District Court's dismissal of Hoch-Parker's Ticket Law claim for lack of

---

As an initial matter, *Spokeo* involves the assertion of standing absent a showing of "concrete harm." The question presented does not address the separate requirement that an Article III injury must be sufficiently "particularized." Having chosen not to purchase a Super Bowl ticket, Hoch-Parker asserts *no* particularized harm at all.

Second, *Spokeo* concerns the limits that Article III places on Congress's ability to create a statutory cause of action. It does not address the separate issue of whether a *state legislature* can elevate harms to the status of Article III injuries in the context of diversity jurisdiction. That issue raises serious federalism concerns absent from the *Spokeo* case.

Third, Hoch-Parker's *Spokeo* argument is ultimately futile. Whatever the contours of Article III, the New Jersey Consumer Fraud Act only permits a private plaintiff to sue when that plaintiff has suffered an "ascertainable loss of moneys or property." N.J. Stat. Ann. § 56:8-19. Although we do not reach the merits of Hoch-Parker's claims, we nonetheless observe that Hoch-Parker nowhere explains how, even if *constitutional* standing can rest on a bare statutory violation, he would have *statutory* standing absent the kind of injury that New Jersey law requires.

Article III standing.[66]

### C. Finkelman Does Not Allege an Article III Injury

We also conclude that Finkelman has failed to allege facts which, if true, would be sufficient to establish Article III standing.

The complaint purports to bring a class action on behalf of "all persons who paid for . . . tickets to Super Bowl XLVIII in excess of the printed ticket price" and alleges that class members "suffered ascertainable losses consisting of the purchase price of the ticket in excess of the face value."[67] Whereas Hoch-Parker never purchased any tickets, we will assume that Finkelman purchased two $2,000 tickets with an original face price of $800 each.[68] The question is whether this $2,400 difference—or any portion of it—amounts to an injury-in-fact caused by the NFL's alleged misconduct.

---

[66] The complaint is somewhat ambiguous as to whether plaintiffs' unjust enrichment claim is brought in the name of Finkelman, Hoch-Parker, or both. Because that claim alleges that "[p]laintiffs and the putative Class paid an amount for tickets that exceed [sic] the value of the tickets" (First. Am. Compl. ¶ 53), and since Hoch-Parker paid nothing for any tickets, we will construe the unjust enrichment claim as being brought by Finkelman as the sole class representative.

[67] *Id.* ¶¶ 38, 50.

[68] *See supra* note 16.

In exploring this question, we are cognizant of the fact that "[t]he choice among alternative definitions of the injury may control the determination of causation."[69]   We will therefore examine the allegations in the complaint from a number of different angles to see if Finkelman's purported injury can be framed in a way that satisfies Article III.

### 1.      Theory One:  The NFL's Alleged Misconduct Prevented Finkelman from Purchasing a Face-Price Ticket

One way to understand Finkelman's claim is that, but for the NFL's withholding of more than 5% of Super Bowl tickets from sale to the general public, he would have been able to buy such a ticket at face price.  In view of the facts alleged in the complaint, however, Finkelman has not adequately asserted that his inability to buy a face-price ticket is fairly traceable to any actions by the NFL.

In order to explain why causation is such a difficult issue in this case, it is helpful to start with an example. Imagine that there are ten people in line to attend a concert at a venue with only ten seats.  It turns out, unbeknownst to the would-be ticket buyers, that the event organizer has violated the Ticket Law by withholding 50% of tickets for corporate insiders.  The first five people in line are able to buy a ticket at face price, but just as the sixth person reaches the ticket counter, the clerk puts a "SOLD OUT" sign in the window and turns off the lights.  The sixth person in line then (i) buys

------

[69] 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction § 3531.5 (3d ed. 2008).

a ticket from one of the five insiders in the resale market at a price higher than face value, and (ii) sues the event organizer under the Ticket Law. She seeks, as damages, the difference between the face price of the ticket and the higher price she actually paid.

In this scenario, our plaintiff should have no trouble alleging that she suffered an injury-in-fact fairly traceable to the defendant's conduct. But for the defendant's illegal withholding, our plaintiff—as the sixth person in line—would have been able to buy a ticket at face price.[70]

This example reflects the same theory that Finkelman proffers here. He seeks as damages the difference between the $800 face price of Super Bowl tickets and the $2,000 price he paid in the resale market.[71] But while this theory of recovery works very well as applied to our hypothetical, it completely falls apart in relation to Finkelman.

The problem is that Finkelman failed to enter the

---

[70] One might also ask whether the eleventh person in line would have standing. It seems clear to us that if the defendant in such a case could show that (i) there were only ten tickets available, and (ii) the plaintiff was the eleventh person in line, and then moved for dismissal on causation grounds, the district court would have no choice but to dismiss the case for lack of standing.

[71] Indeed, presumably Finkelman actually seeks more than this difference as damages. The Consumer Fraud Act *mandates* that successful plaintiffs receive treble damages and attorneys' fees and costs. *See* N.J. Stat. Ann. § 56:8–19.

NFL's ticket lottery. Irrespective of whether the NFL withheld tickets in violation of the Ticket Law—a question we do not reach here—Finkelman chose to buy his tickets on the secondary market. As a result, there was always a *zero* percent chance that he could procure a face-price ticket. In this sense, any harm that Finkelman suffered is properly attributed not to the NFL, but rather to his own decision not to enter the ticket lottery.[72]

---

[72] We note that Finkelman's inability to obtain a face-price ticket in the resale market is itself a consequence of the incredibly high demand for Super Bowl tickets. Since 95% of entertainment events in New Jersey do not sell out, *see supra* note 6, it is almost never clear ahead of time whether buying tickets to an event with the plan to resell them for a profit will be a good investment. Ticket brokers therefore "assume the risk of not being able to sell [their] tickets." Stephen Happel & Marianne M. Jennings, *The Eight Principles of the Microeconomic and Regulatory Future of Ticket Scalping, Ticket Brokers, and Secondary Ticket Markets*, 28 J.L. & Com. 115, 129 (2010).

Thus, for most events, a fan might be able to obtain a ticket for face price (or less!) from a broker desperate to recoup some portion of his or her investment in the waning moments before an event begins. Here, by contrast, plaintiffs assert that the demand for Super Bowl tickets is so overwhelming that, once in the secondary market, a fan "*must* pay substantially more than the ticket's face value." (First Am. Compl. ¶ 1 (emphasis added).) Plaintiffs therefore agree: once Finkelman chose not to enter the lottery, it was impossible for him to pay face price for a ticket.

Finkelman tries to rebut this view by arguing that it would be unfair to require him to have entered the lottery in order to assert standing. As Finkelman puts it, such a ruling would "amount to no less than conditioning Plaintiffs' standing to seek redress for Defendants' unlawful conduct upon their participation in the very wrongdoing they seek to challenge."[73] Though this argument may have some intuitive appeal, it ultimately misses the mark.

Finkelman is of course correct that the law does not always require a plaintiff to participate in some allegedly unlawful practice in order to bring a lawsuit challenging that practice.[74] Even so, the obstacle facing Finkelman is more fundamental. The causation element of standing requires a plaintiff to allege facts sufficient to show that his or her injury is "fairly traceable" to the alleged wrongdoing of the defendant.[75] We have explained that traceability requires, at a minimum, that the defendant's purported misconduct was a "but for" cause of the plaintiff's injury.[76] And, if we treat Finkelman's injury-in-fact as his inability to obtain face-price tickets to the Super Bowl, *that* injury is simply not traceable

---

[73] Appellants' Br. at 36.

[74] *See, e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489–91 (2010) (describing circumstances in which district courts have subject matter jurisdiction to consider a challenge to an administrative adjudication even when the agency action has not yet terminated).

[75] *Toll Bros.*, 555 F.3d at 142.

[76] *See Edmonson*, 725 F.3d at 418.

to the NFL's withholding of tickets given that Finkelman sought tickets only in the resale market.[77]

Any other conclusion is untenable. Were we to adopt Finkelman's view of standing, *anyone* who bought a Super Bowl ticket from a reseller could sue the NFL to recover three-times the difference between the purchase price and face price.[78] One might ask: what if the only ticket Finkelman could find was on sale for $10,000? Or $15,000? Or $20,000? No matter. On the theory of injury articulated in plaintiffs' complaint, everyone who bought a resold ticket could sue the NFL for any costs above face price, irrespective of having chosen not to enter the ticket lottery. Because this theory of standing fails to account for the need to show a causal connection between plaintiffs' alleged injury and the NFL's conduct, we have no choice but to reject it.

Indeed, Finkelman's standing difficulties would likely be insuperable even if the NFL had committed only a *de minimis* violation of the Ticket Law by distributing 6% of tickets to League insiders and selling 94% of tickets to members of the general public on a first-come, first-served

---

[77] One might argue that, even if Finkelman cannot allege that the NFL *prevented* him from obtaining a face-price ticket, the NFL's alleged withholding of tickets perhaps *diminished his chances* of acquiring a face-price ticket. Here again, though, Finkelman runs into the problem that he failed to enter the ticket lottery. His chance of obtaining a face-price ticket was always zero.

[78] *See supra* note 71 (discussing mandatory damages under the Consumer Fraud Act).

28

basis. Unless Finkelman could allege facts indicating that, as in our hypothetical, he was one of the "next people in line," demand for Super Bowl tickets so far exceeds supply that Finkelman's probability of obtaining a face-price ticket in a public sale would have been effectively nil regardless of the NFL's ticketing practices. Any argument that Finkelman could have procured a face-price ticket to the Super Bowl—at least on the facts alleged in the complaint before us—is ultimately conjectural and speculative. It is, in short, precisely the kind of allegation that cannot sustain Article III standing.[79]

Consequently, Finkelman has failed to allege standing on the theory that, but for the NFL's alleged withholding, he would have been able to purchase a face-price ticket.

> **2. Theory Two: Finkelman Paid a Higher Price in the Resale Market Due to the NFL's Withholding of Tickets**

We will also consider another way of framing the Article III injury in this case—one emphasized by plaintiffs' counsel at oral argument. Instead of thinking of Finkelman's injury as his inability to acquire a face-price ticket, we might focus instead on the increased price he allegedly paid for his tickets *on the resale market*. In other words, it may be the case that, but for the NFL's alleged wrongdoing, the price Finkelman paid for a resold ticket would have been cheaper. This argument relies on the basic principle that "[a] reduction

---

[79] *See Blunt*, 767 F.3d at 278; *Aichele*, 757 F.3d at 364.

in supply will cause prices to rise."[80]  One might suppose that if the NFL were withholding Super Bowl tickets, its behavior would have had the effect of decreasing the supply of tickets in the resale market and driving up those tickets' prices.

To give a concrete example, imagine that, for a given event, the face price of a ticket is $100 and its price on the resale market is $200.  If we assume that an event organizer's illegal withholding drives up the price on the resale market, it may be that, but for the withholding, the price on the resale market would have been $180.  In this example, a plaintiff's injury-in-fact is not $100 (the difference between the face price and the resale price), but $20 (the difference between the resale price with and without the defendant's illegal withholding).

In conceptualizing Finkelman's injury this way, we recognize that the First Amended Complaint did not allege this theory of harm as clearly as it could have.  Indeed, Finkelman primarily sought as damages "the purchase price of the ticket in excess of the face value."[81]  Nonetheless, drawing all reasonable inferences in Finkelman's favor, we find that he sufficiently raised this price-inflation theory of injury below.  We will therefore consider the argument that his Article III injury is *not* the $1,200 premium he paid per ticket, but rather some unspecified portion of that amount attributable to the NFL's alleged withholding.

---

[80] *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152 (3d Cir. 2002).

[81] First Am. Compl. ¶ 50.

At first blush, this might seem to be a promising way for Finkelman to establish standing. But there is a problem. Demand for tickets to the Super Bowl is so high that those tickets command, on plaintiffs' own telling, several times their face price in the resale market.[82] Assuming that Finkelman is correct that the NFL allocated some 99% of Super Bowl tickets to League insiders, those insiders had the same incentive to resell their tickets as the unnamed broker who sold Finkelman *his* two tickets: they could make an enormous profit by doing so. Thus, while it *might* be the case that the NFL's withholding increased ticket prices on the resale market, it might *also* be the case that it had *no* effect on the resale market.[83]

Indeed, on the facts alleged here, withholding tickets from the general public and distributing them to League insiders might have even *increased* the supply of tickets on the resale market, leading to *lower* prices. The complaint never specifies whether the NFL insiders who received the vast majority of Super Bowl tickets had to pay for those tickets in the first instance. Now, compare two potential ticket resellers. The first, an individual fan, could resell his or her ticket and pocket as profit the difference between the

---

[82] *See id.* ¶ 27 (alleging that tickets for the 2013 Super Bowl with a face price of $600 sold in the secondary market for $3,000); *id.* ¶ 35 (alleging that Hoch-Parker could not find a ticket to the 2014 Super Bowl for less than $4,200).

[83] *See* Happel & Jennings, *The Eight Principles of the Microeconomic and Regulatory Future of Ticket Scalping*, 28 J.L. & Com. at 162 (explaining that held-back tickets "do make their way into secondary markets").

resale price and the up-front cost of the ticket. The second, a League insider who received a ticket for free, could make even more money by pocketing the entire resale price of the ticket as profit. For this reason, League insiders might have been especially eager to resell their tickets—meaning that the NFL's ticket distribution practices may have actually *increased* the number of ticket sellers in the secondary market. Since an increase in supply leads to lower prices, it is entirely possible that Finkelman was able to a buy a ticket for *less* money than if members of the general public had been able to purchase 95% of all tickets in the first instance.

To state the problem succinctly: we have no way of knowing whether the NFL's withholding of tickets would have had the effect of increasing or decreasing prices on the secondary market. We can only speculate—and speculation is not enough to sustain Article III standing.

This conclusion may seem counterintuitive. After all, Finkelman is pursuing a simple price inflation theory based on the relationship between supply and demand in the ticket resale market, and federal courts typically credit allegations of injury that involve no more than "application of basic economic logic."[84] But there is a difference between allegations that stand on well-pleaded facts and allegations that stand on nothing more than supposition.

In explaining that difference, it may be helpful to compare failure to allege an Article III injury with failure to state a plausible claim under Rule 12(b)(6). The Supreme

---

[84] *United Transp. Union v. I.C.C.*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989).

32

Court's decision in *Bell Atlantic v. Twombly* is the touchstone. The plaintiffs there, who purported to represent a class of telephone and high-speed Internet service subscribers, alleged that the companies that provided these services had conspired to minimize competition and to inflate service charges.[85] So far, so good: a person who claims to have paid inflated prices resulting from an antitrust conspiracy clearly alleges an Article III injury. Where plaintiffs fell short was in alleging facts that would lead to the plausible inference that the defendants had entered a conspiracy at all. The complaint focused only on defendants' "parallel conduct," and parallel conduct, standing alone, is not necessarily "suggestive of conspiracy."[86] Because plaintiffs' allegations were not sufficient to "nudge[] their claims across the line from conceivable to plausible," they failed to state a claim under Rule 12(b)(6).[87]

It is thus fair to say that, in *Twombly*, the plaintiffs looked around and saw conduct *consistent* with a conspiracy, but they saw no facts that indicated more plausibly that a conspiracy actually existed. Finkelman's situation is different. Given the NFL's ticket distribution practices, he knows precisely how the NFL allegedly violated the law. But when it comes to injury, he looks only to the difference between a ticket's $800 face price and the price he paid and says, "I have a strong suspicion that this ticket would have been cheaper if more tickets had been available for purchase

---

[85] 550 U.S. at 550.

[86] *Id.* at 568.

[87] *Id.* at 570.

33

by members of the general public." *That* claim rests on no additional facts at all. It is pure conjecture about what the ticket resale market might have looked like if the NFL had sold its tickets differently. Article III injuries require a firmer foundation.

The D.C. Circuit's decision in *Dominguez v. UAL Corp.* provides a helpful point of comparison.[88] The plaintiff there sued United Air Lines under the federal antitrust laws, asserting that United's prohibition on reselling airplane tickets deprived him of a secondary market in which he might have been able to purchase tickets for less money than he paid United.[89] While the district court granted summary judgment in favor of the defendant, the D.C. Circuit concluded that the district court should have dismissed the case for lack of Article III standing.

The D.C. Circuit reached this conclusion even though the plaintiff had introduced testimony from an expert who surveyed United's customers and concluded that "a high percentage of respondents would consider using a feature that allowed them to legally sell or give away airline tickets they are unable to use."[90] In the plaintiff's view, this was sufficient to show that United's prohibition on a secondary market for airplane tickets caused him an injury-in-fact. The D.C. Circuit disagreed. It noted that the plaintiff's expert had failed to take into account the costs of changing United's

---

[88] 666 F.3d 1359 (D.C. Cir. 2012).

[89] *Id.* at 1360–61.

[90] *Id.* at 1363.

reservation system, the possible introduction of new, seller-imposed fees, and myriad other factors that might influence prices in a hypothetical resale market. Thus, the plaintiff could not show "that any secondary market would have led to a lower price than what [the plaintiff] paid," and the absence of a plausible injury-in-fact required dismissal.[91]

*Dominguez* illustrates the intractable standing problems that may arise when a lawsuit rests on allegations about a hypothetical resale market. Like the plaintiff in that case, Finkelman only can speculate as to whether, absent the NFL's withholding, the prices he paid in the resale market would have been cheaper. He has to guess. In the final analysis, Article III requires more than this kind of conjecture.[92]

To be fair, one might point out that *Dominguez* was handed down after discovery had concluded, whereas Finkelman has not had a chance to introduce evidence that might more fully flesh out his theories of injury and causation.

---

[91] *Id.*

[92] We emphasize that Finkelman's standing issues arise from an unusual combination of factors, including reliance on claims about a hypothetical resale market and the NFL's idiosyncratic ticketing practices. In the mine run of cases, where a complaint alleges that the defendant committed an unlawful act that caused a traditional injury, the most plausible inference will be that the plaintiff sustained an Article III injury. The *amount* of damages is then a question of proof. Here, by contrast, the complaint does not permit the plausible inference that Finkelman suffered any injury at all.

Indeed, at oral argument, his counsel suggested that he had an economist ready to testify that the NFL's withholding of tickets increased the price that Finkelman paid in the resale market.[93]

We are of course mindful that, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."[94] But we have been careful to note that, even at the pleading stage, "we need not accept as true unsupported conclusions and unwarranted inferences."[95] Insofar as we construe the complaint to allege that Finkelman paid more for his tickets than he would have absent the NFL's alleged misconduct, that contention is a "bald assertion" unsupported by well-pleaded facts.[96] Nor are we persuaded by plaintiffs' counsel's promises of future expert testimony when no facts supporting plaintiffs' theory

---

[93] Oral Arg. Recording at 23:26–24:07.

[94] *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994) (quoting *Defenders of Wildlife*, 504 U.S. at 561).

[95] *Maio v. Aetna, Inc.*, 221 F.3d 472, 500 (3d Cir. 2000) (internal quotation marks omitted).

[96] *Morse*, 132 F.3d at 906.

of injury appear within the four corners of the complaint.[97]

We conclude that Finkelman's difficulties in alleging an injury-in-fact are insurmountable. Because the District Court lacked subject matter jurisdiction to reach the merits of plaintiffs' claims, we will therefore vacate its dismissal of Finkelman's Ticket Law and unjust enrichment claims under Rule 12(b)(6).[98]

---

[97] In its current posture, this case does not require us to consider the correct result if plaintiffs' counsel had included allegations about his proffered expert in the complaint itself. We simply note that, in circumstances where the sufficiency of an allegation regarding an injury-in-fact is contested at the motion to dismiss stage, district courts have numerous procedural devices available to them to satisfy themselves of their Article III jurisdiction. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 288 (3d Cir. 1999) (explaining that a district court may convert a motion to dismiss into one for summary judgment, provided that all parties receive a "reasonable opportunity" to present relevant evidence); *Doherty v. Rutgers Sch. of Law-Newark*, 651 F.2d 893, 898 n.6 (3d Cir. 1981) (district courts, when assessing pre-discovery challenges to standing, may consider plaintiffs' affidavits or conduct preliminary evidentiary hearings).

[98] While standing arises on a claim-by-claim basis, Finkelman alleges the same injury for purposes of his Ticket Law and unjust enrichment claims. We therefore need not engage in a "claim-by-claim" discussion of standing. *Toll Bros.*, 555 F.3d at 138 n.5.

## IV.  Conclusion

The threshold requirements of standing are "moored in the constitutional principle that the judiciary's power only extends to cases or controversies."[99]  In reaching our conclusions in this case, we neither interpret the Ticket Law's meaning nor pass judgment on future Ticket Law claims.  The New Jersey Attorney General can always sue to enforce the Law, and the courts of New Jersey remain open to such suits.  But Hoch-Parker and Finkelman chose to sue in federal court, and their failure to allege the elements of standing means that we lack jurisdiction to adjudicate their claims.

We will therefore affirm the District Court's judgment with respect to Hoch-Parker and vacate the District Court's judgment with respect to Finkelman.  Because the NFL did not raise the issue of Finkelman's Article III standing before the District Court,[100] we will dismiss this appeal without prejudice for lack of jurisdiction and remand to the District Court for further proceedings consistent with this Opinion.[101]

---

[99] *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 232 (3d Cir. 2013) (internal quotation marks omitted).

[100] *See* NFL Mem. of Law, Case No. 14-cv-96 (PGS), ECF No. 19-1 (discussing standing in relation to Hoch-Parker but not Finkelman); NFL Reply Mem., ECF No. 50 (same).

[101] *See Pa. Prison Soc'y v. Cortes*, 508 F.3d 156, 169 (3d Cir. 2007) (dismissing an appeal without prejudice for lack of jurisdiction when, "[b]ecause the issue of standing was raised for the first time on appeal, none of the plaintiffs have had the opportunity to present evidence or to litigate this issue.").

On remand, the District Court may exercise its discretion as to whether plaintiffs should be granted leave to amend their complaint.[102]

---

[102] *See Newark Branch, N.A.A.C.P. v. Town of Harrison*, 907 F.2d 1408, 1418 (3d Cir. 1990) (holding that a district court may consider a motion to file an amended complaint when the earlier complaint fails to adequately allege standing).