ROTH, Circuit Judge, dissenting. Article III of our Constitution is a strict master, preserving constitutional strictures imposed on courts through the requirement that only true cases and controversies be heard. The Majority today, however, erodes these strictures by allowing the plaintiffs here to manufacture a purely speculative injury in. order to invoke our jurisdiction.. They assert that the defendants could have manufactured a more efficient product, which in turn could have lowered plaintiffs’ overall treatment costs. Because this approach ignores both .clear precedent from the Supreme Court and the complexities of pricing in the pharmaceutical industry, I respectfully dissent. I I begin by defining the exact nature of the harm that the plaintiffs claim to have suffered as a result of the defendants’ conduct. The plaintiffs are the users of prescription eye drops for various visual ailments. The defendants manufacture and sell the eye drops used by the plaintiffs in bottles containing a fixed volume of fluid., The bottles have dropper tips, which dispense more fluid than is medically necessary to treat the plaintiffs’ ailments, causing some portion of each drop to be wasted. While the plaintiffs and the Majority note that exposing one’s eyes to too much of the fluid can have negative side effects, no plaintiff in-the purported class alleges to have suffered harmful medical consequences. The plaintiffs’ sole injury, therefore, is the money spent on that portion of a single eye.drop which exceeds the medically necessary volume.[1] The plaintiffs do not argue that they were charged more than the market price, for eye drops; rather, they argue that the defendants could manufacture a hypothetical eye dropper that would dispense the exact amount of fluid needed to maximize efficacy without waste. Were the defendants to produce such a dropper,, they continue, the effective lifespan of each bottle of medicine would increase, reducing the plaintiffs’ long-term treatment costs by reducing the number of bottles each plaintiff would have to purchase. Notably, their case depends on the assumption that no other changes would occur in the market to prevent them from capturing the additional value of each bottle at no extra cost. It is the strength of this assumption that we must evaluate. II As the Majority recognizes, constitutional standing has three core elements: (1) an injury in fact, (2) causation, and (3) re-dressability.[2] A complaint must adequately plead all three elements to invoke federal court jurisdiction.[3] In reviewing the adequacy of a complaint’s assertion of standing, we employ the familiar standards used in evaluating motions to dismiss for failure to state a claim; we accept all of the plaintiffs factual allegations as true, reject conclusions, and assess the plausibility of the plaintiffs standing in light of the well-pleaded allegations.[4] In this evaluation, however, we may make only reasonable inferences in support of the plaintiffs claim to standing.[5] This case turns on whether the plaintiffs have adequately alleged the “[fjirst and foremost”[6] of the “irreducible constitutional minimum”[7] of standing: injury in fact. Such injury must be sufficiently concrete; “that is, it must actually exist.”[8] As such, the Supreme Court has repeatedly expressed “reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.”[9] Complaints alleging such abstract and speculative injuries have been rejected, both by our Court and by the Supreme Court for failing to give rise to a reasonable inference of injury in fact.[10] While the Majority properly notes these governing principles of constitutional standing,[11] it ignores clear law cautioning against recognizing Article III standing based on the types of conjectural allegations that the plaintiffs advance here. Further, the Majority’s reasoning ignores the complex nature of pharmaceutical markets as they currently operate, relying on an unreasonable set of assumptions to reach its desired outcome. I address both issues in turn. A Just last year, in Finkelman v. National Football League, we reaffirmed that “[p]laintiffs do not allege an injury-in-fact when they rely on a chain of contingencies or mere speculation.”[12] I believe that Fink-elmcm all but decides this case. There, a plaintiff brought suit against the NFL, alleging that the NFL’s practice of withholding approximately 99% of Super Bowl tickets for certain insiders artificially inflated the price of tickets available via the resale market. The plaintiff argued that he suffered an economic injury because he was forced to buy a ticket on the secondary market for $2,000, which was $1,200 more than the face value of the ticket.[13] We held that this allegation was insufficiently concrete, and declined to recognize his standing to sue. We properly recognized that markets operate in complex ways. First, we noted that insiders faced the same incentives to sell their tickets on the secondary market as did the general public. Second, we noted that, given the insiders’ potential profit margins, insiders were more likely to sell on the secondary market at lower prices, suggesting that the withholding could have no effect, and potentially even a positive one, on secondary market prices. Taken together, these two propositions made clear that any potentially unlawful conduct by the NFL did not necessarily result in higher prices to the plaintiff; we concluded that “we have no way of knowing whether the NFL’s withholding of tickets would have had the effect of increasing or decreasing prices on the secondary market.”[14] While Finkelman spoke primarily about market unpredictability in the context of third party action, it relied heavily on the Court of Appeals for the District of Columbia Circuit’s opinion in Dominguez v. UAL Corp.,[15] which involved no intervening third parties. There, a plaintiff sought to challenge a policy by United Airlines that prevented resale of tickets, arguing that allowing a secondary market would bring down prices in the aggregate. Much like the plaintiffs here have done by attaching scientific studies to their Amended Complaint, Dominguez introduced expert evidence demonstrating that, holding all other forces being equal, a change in United Airlines’s policy would result in lower overall prices for consumers. The D.C. Circuit rejected this argument, reasoning that it “assume[d] that United would continue to offer the same types of tickets that it does now” without accounting for the possibility that United “would need to alter its pricing strategy, which may very well result in higher average ticket prices.... ”[16] Because this attempt to “pile[ ] speculation atop speculation” fell short of Dominguez’s obligations under Article III, the D.C. Circuit held that Dominguez lacked standing to bring the action.[17] Taken together, Finkelman and Dominguez make clear that, for purposes of analyzing economic injuries in the context of marketwide effects, we cannot do precisely what the plaintiffs here ask of us: isolate and change one variable while assuming that no downstream changes would also occur. These cases are not outliers; rather, they reflect courts’ skepticism about plaintiffs’ ability to satisfy the case or controversy requirement of Article III by relying on such imaginative economic theories.[18] Thus, contrary to the Majority’s assertion,[19] the plaintiffs’ pricing theory does in fact depend on exactly the sort of presumption rejected by us and by other courts—namely, the presumption that no other aspects of the market would change once, the defendants’ conduct did. It is true that we “credit allegations of .injury that involve no more than application of basic economic logic,”[20] However, Finkelman makes clear that this principle distinguishes “between allegations that stand on well-pleaded facts and allegations, that stand on nothing more than supposition.”[21] As other courts have noted, this distinction is critical at the pleading stage for a simple reason: assumptions about basic economic logic are susceptible to proof at trial.[22] The plaintiffs here ask more: they ask us to assume certain facts' about other actors’ behavior—exactly the sort of assumption that cannot be proven at trial. Accordingly, I would reject' the plaintiffs’ alleged economic injury as overly speculative and untenable under existing precedent.[23] B. Although the speculative nature of the plaintiffs’ alleged injury would likely be fatal regardless of the nature of the product, it is worth noting that their theory is a particularly bad fit for the market for pharmaceuticals, undercutting the reasonableness of the assumptions they ask us to make and the inference of economic harm they ask us to draw in their favor. The plaintiffs essentially ask us to assume that the defendants price them medication by volume; thus, in the plaintiffs! view, changing the eyedropper size would not change the price of the medicine, while extending the useful lifespan of each bottle, driving down their aggregate costs. This assumption is unreasonable, given the unique nature of markets for- medical goods and services. . Pharmaceutical companies have, for some time now, recognized that “unit-based pricing! ]' is too one-dimensional for the marketplace’s current needs.”[24] Increasingly, ‘ throughout the United States and the world, manufacturers engage in “value-based pricing” which deemphasizes the overall volume of medicine received by the patient in favor of an assessment of the value-measured in part by effective doses—received by a patient.[25] Amici raise this point effectively in their briefing, noting that “patients demand treatment, not fluid volume, so demand for defendants’ products is properly measured in doses, not in milliliters.”[26] Thus, alternative pricing models have begun to take hold in pharmaceutical markets across the world.[27] Some of the plaintiffs’ own studies confirm this, noting that the cost of the plaintiffs’ therapy “may be based on several factors [including drop size].”[28] The net effect of this shift is to sever the link between volume and price upon which the plaintiffs’ alleged injury depends. As amici argue, therefore, it is likely that the defendants “priced their products based on how many therapeutic doses (not how many milliliters ofl fluid) they contained, so that improvements in the products’ efficiency would not have saved the plaintiffs any money.”[29] The plaintiffs, in the same breath in which they accuse the District Court of misunderstanding their pricing theory, misunderstand the importance of such countervailing market forces. As the District Court observed, the studies provided by the plaintiffs all tend to “assume[ ] as true that manufacturers of eye drops would price their medication solely based on the volume of the fluid contained in the bottled.”[30] The reason for this observation is not to suggest that the defendants would lower their prices in response to a new dropper design; rather, it is to suggest that the price of each bottle could actually increase if each bottle provided more doses. At its core, therefore, the plaintiffs’ Amended Complaint asks us to make an assumption about the effects of changing the size of the defendants’ eye droppers which does not reflect market conditions and pressures in the pharmaceutical industry. As such, the plaintiffs ask us to speculate about a theoretical eye dropper design, then draw an unreasonable inference about the downstream consequences of such an innovation. Because the realities of the pharmaceutical industry make such inferences unreasonable, the Majority errs by accepting them at face value. The plaintiffs have failed to plausibly allege standing. Ill I am sympathetic to the difficulties in demonstrating marketwide injuries in class action litigation. The difficulty of such a showing, however, is not an excuse to treat jurisdiction lightly; “jurisdiction is a strict master.”[31] Today’s ruling flouts this principle, allowing class action plaintiffs to ignore “the exacting federal standing requirements”[32] by offering nothing more than speculation about complex and industry-specific pricing models. On a practical level, the Majority also invites judges— rather than industry experts, market forces, or agency heads—to second-guess the efficacy of product design even in the most opaque of industries. Because I am troubled by both the legal and practical ramifications of the Majority’s decision, I respectfully dissent. . While the plaintiffs and the Majority discuss two separate theories explaining how to arrive at this figure—the "pricing theory” and the "reimbursement theory”—both depend on the critical assumption that pricing was based on volume, not on effective doses. I find this assumption untenable, and therefore I will not address the theories separately. . Hassan v. City of N.Y., 804 F.3d 277, 289 (3d Cir. 2015), . Id. . In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012). . In re Horizon Healthcare Servs. Inc. Data Breach Litig., 846 F.3d 625, 633 (3d Cir. 2017). . Steel Co. v. Citizens for Better Env’t, 523 U.S. 83, 103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). . Spokeo, Inc. v. Robins, — U.S. —, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). . Id. at 1548. . Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013). . See, e.g., Summers v. Earth Island Inst., 555 U.S. 488, 495-96, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009); Whitmore v. Arkansas, 495 U.S. 149, 157, 110 S.Ct 1717, 109 L.Ed.2d 135 (1990); City of L.A. v. Lyons, 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (“Abstract injury is not enough.”); Knick v. Township of Scott, 862 F.3d 310, 319 (3d Cir. 2017); Miller v. Nissan Motor Acceptance Corp., 362 F.3d 209, 225 (3d Cir. 2004). . I take no issue with the Majority’s conclusion that actual economic injuries are generally invasions of legally protected interests, or that the alleged injury here would be particularized to purchasers of the eye drops. I disagree, however, with the Majority’s conclusion that the plaintiffs’ alleged economic injuries "actually exist.” Spokeo, 136 S.Ct. at 1547. . Finkelman v. Nat’l Football League, 810 F.3d 187, 193 (3d Cir. 2016) (internal quotation marks omitted). . Id. at 197-98. . Id. at 200. . 666 F.3d 1359 (D.C. Cir. 2012). . Id. at 1364. . Id. . See, e.g., DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 344-45, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (finding an alleged injury too conjectural for failing to account for "how [other actors] respond to a reduction in revenue ... ”); . Maj. Op. at 169 (distinguishing Finkelman on the grounds that "Plaintiffs' pricing theory does not depend on a comparable presumption essential to their allegations of financial harm”). . Finkelman, 810 F.3d at 201 (internal quotation marks omitted). . Id. . Osborn v. Visa Inc., 797 F.3d 1057, 1064-65 (D.C. Cir. 2015) (finding basic economic assumptions sufficient to satisfy injury requirement where plaintiffs’ “sorts of assumptions [we]re provable at trial”). . See United Transp. Union v. I.C.C., 891 F.2d 908, 912 (D.C. Cir. 1989) ("When considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties).,..”), . Ellen Licking & Susan Garfield, A Road Map To Strategic Drug Pricing, In Vivo, March 2016, at 1, 3, available online at http://www. ey.com/Publication/vwLUAssets/ey-in-vivo-a-road-map-to-strategic-drug-prices-subheader/$FILE/ey-in-vivo-a-road-map-to-strategic-drug-prices-subheader.pdf,. . Deloitté Center for Health Solutions, Value-based PRICING FOR PHARMACEUTICALS: IMPLICATIONS OF THE SHIFT FROM VOLUME TO VALUE 3 (2012), available online at http://deloitte.wsj.com/cfo/ files/2012/09/V alueBasedPricingPharma.pdf. Pricing in the medical services sector is unique in this regard, as the standard economic forces that set prices for consumer goods do not apply to prescription drugs. This is in part due to the disjunction between the source of payment for services (insurers) and the end users of services (patients). See Licking & Garfield, A Road Map To Strategic Drug Pricing, at 3. . Amicus Br. of the Am. Tort Reform Assoc., U.S. Chamber of Commerce, Nat’l Assoc. of Mfrs., & Pharma. Research & Mfrs. of Am. (hereafter, "ATRA Br.”) at 11. . Licking & Garfield, A Road Map to Strategic Drug Pricing, at 7. . Am. Compl. ¶ 192. . ATRA Br. at 9. . JA 17. . State Nat’l Ins. Co. v. Cty. of Camden, 824 F.3d 399, 411 (3d Cir. 2016) (internal quotation marks omitted). . Goode v. City of Phila., 539 F.3d 311, 318 (3d Cir. 2008).