FUENTES, Circuit Judge,
concurring in part, dissenting in part, and dissenting from the judgment.
Customs Fraud Investigations, LLC (“CFI”) brings this action under the False Claims Act, alleging a ten-year scheme to defraud the government on the basis of statistical evidence alone.[1] That evidence *260 consists almost entirely of non-random observations gleaned from product advertisements- on the website of the online retailer eBay. Whereas Twombly and Iqbal require plausible allegations of wrongdoing, CFI gives us unsupported assumptions and numerical guesswork. Whereas Rule 9(b) requires that fraud be alleged with particularity, CFI gives us ten years of raw import data and insists there is evidence of fraud in there, somewhere, while completely failing to identify which shipments, during which time periods, at which ports were illegal. The mere suggestion of fraud, which is all CFI has alleged, is not enough to state a plausible claim or to satisfy the heightened pleading standards of Rule 9(b).
Faced with obvious deficiencies in CFI’s allegations, the District Court granted the defendant’s motion to dismiss the complaint—with prejudice—and then denied CFI’s motion to reopen the judgment so that it could file an amended complaint. I disagree with the majority’s decision to vacate the District Court’s dismissal and reinstate this case. When asserting a violation of the False Claims Act, a plaintiff must state a plausible claim and allege fraud with particularity. CFI has failed in both respects. I therefore partially dissent.[2]
I. The Proposed Amended Complaint Fails to Allege a Plausible Claim
CFI’s eight-page, 35-paragraph complaint alleges that Victaulic, a manufacturer of iron and steel pipe fittings, has engaged in a decade-long scheme to defraud the government by mismarking its imported products. The District Court dismissed that complaint for failure to allege a plausible claim within the meaning of Twombly and Iqbal.[3] When CFI moved to reopen the judgment, the District Court denied that motion too—this time, not on plausibility grounds, but for reasons that included undue delay and CFI’s failure to satisfy Rule 9(b)’s heightened standard for pleading fraud in its proposed amended complaint.[4]
Because this is an appeal from the District Court’s final order, we would ordinarily limit our review to issues arising from CFI’s motion to reopen the judgment—ie., undue delay and the proper application of Rule 9(b). But the real problems with the proposed amended complaint run deeper. Since “[w]e exercise plenary review over a decision granting a motion to dismiss!,] ... ‘[w]e may affirm the district court on any ground supported by the record.’”[5] I therefore think it’s worth exploring whether the proposed amended complaint even raises a plausible allegation under the False Claims Act, *261 much less whether it makes those allegations with the requisite particularity.
CFI says that before suing Victaulic it conducted a “complex, and multifaceted analysis.”[6] I am not willing to credit this characterization. In my view, CFI’s investigation into Victaulic’s imports is incapable of supporting the kinds of statistical inferences that CFI wants us to draw. To explain why, I begin by summarizing some basic principles of valid survey design. I then apply those principles, to assess the plausibility of the allegations in CFI’s proposed amended complaint.
A. The Fundamentals of Statistical Sampling
A valid statistical survey essentially has three steps: (i) identify a population of interest, (ii) take a random sample from that population, and (iii) use the observations in the sample to draw inferences about the population as a whole.[7] We see examples of this process every day in opinion polls. A survey firm will identify a population to study, draw a random sample from that population, and then, based on its observations, make inferences about that population to a greater or lesser degree of confidence based on the sample size. These principles apply to all probabilistic surveys, including the kind of survey that CFI conducted—or, at least, attempted to conduct—in this case.
There are a few critical.features that are necessary for such a survey to be valid. First, it is important for the sample to be drawn from the correct population of interest. When a survey makes an error relating to “the specification of the population to be sampled ... any estimates made on the basis of the sample data will be biased.”[8] This makes sense. If there are differences between the population being studied and the population actually sampled, the survey’s results will necessarily be unreliable.
Second, a valid statistical sample must be drawn randomly. Surveys rely on random sampling because “[t]he statistics derived from observations or measurements of random samples permit one to estimate the parameters of the population.”[9] Indeed, “random selection is the only selection mechanism ... that automatically guarantees the absence of selection bias. That is because when we use random sampling we are, by definition, assuring the absence of any association that may exist between selection rules and the variables in our study.”[10] In a nonrandom sample, by contrast, the selection rule “may inadvertently ... introduce bias.”[11]
It is frequently the case that a random sample is either not available or difficult to obtain. Survey methodologists and statisti *262 cians have developed numerous tools to address this problem. What a researcher cannot do, however, is draw a nonrandom “convenience sample” simply because the data is close at hand and then assume away all the statistical problems that such a technique creates.[12] Unfortunately, this is precisely what CFI did. In the words of Charles Seife, we are about to be “Fooled by the Numbers.”[13]
B. Step One: The Review of Victaulic Import Data
CFI claims that its president “personally spenft] at least 700 hours” on its investigation,[14] a figure that is fairly extraordinary on its own and only becomes more so once it becomes clear what CFI actually did—and, more to the point, did not do.
CFI’s first step was to estimate the proportion of Victaulic products imported from overseas in recent years. To do so, it reviewed figures from a subscription service, Zepol, that aggregates data from ships carrying imports into the United States.[15] CFI tells us that Zepol is an “expensive fee-based subscription service” with an annual cost of $5,995.[16] It also says that the information in Zepol’s database is so unwieldy as to be comprehensible only by persons who have “worked with customs import data over many years ... [who can] understand what conclusions can properly be drawn” from such data.[17]
CFI queried the database for the word “Victaulic” for the nine-year period between 2003 and 2012.[18] Its president then “personally reviewed the narrative description for every import entry and culled through line by line to eliminate items that were not iron or steel pipe fittings.”[19] We are told that “[o]nly upon completing the above multi-step process was CFI able to obtain a usable database from which Vie-taulic’s imports could then be segregated and tabulated by country and from which CFI could draw reliable conclusions.”[20] In an era when Microsoft Excel or, indeed, any data management software can filter data based on complex queries, it is completely unclear why this kind of line-byline effort was even necessary.
At this point, CFI had constructed a dataset purporting to show all of Victaulic’s imports of pipe fittings into the United States. According to these figures, over the period from 2003 through 2012 Victaulic imported 83 million pounds of pipe fittings from China and Poland (an average of about 9.2 million pounds per year).[21] Between 2010 and 2012, this annual average climbed to 15.2 million pounds per year.[22]
Of course, that figure is not helpful without some baseline. Knowing this, CFI *263 sought to convert Victaulic’s raw imports into a dollar figure, and then to compare that dollar figure against Victaulic’s total revenue. Unfortunately, the Zepol database aggregates information about Victaulic’s imports across several, differently-priced product lines. CFI’s approach to solving this problem was, at best, extremely problematic.
CFI started by using Victaulic’s 2011 price list to compile “a total of 147 separate price observations for 49 different products with three sizes each to arrive at an estimated per pound price of $36.40.”[23] CFI admits that this figure may not be reliable, however, because “[discounts off price lists ... are very common in the pipe fittings industry.”[24] CFI therefore “assume[s] conservatively” that Victaulic’s imported pipe fittings were sold “at deeply discounted prices” averaging between $10 and $15 per pound.[25] Using these figures, CFI estimates that, during the period from 2010 through 2012, Victaulic’s annual sales deriving from Chinese and Polish imports were somewhere between $152 million and $228 million per year.[26]
Next, CFI cites unnamed “[a]uthorita-tive independent sources” for the proposition that ‘Victaulic’s annual revenue is in the approximate range of $250-280 million.”[27] It then uses these numbers to claim that pipe fittings imported from China and Poland accounted for between 54% and 91% of Victaulic’s annual sales between 2010 and 2012.[28]
Drawing all inferences in CFI’s favor, I accept—at least for the sake of argument—that foreign-made pipe fittings accounted for between 54% and 91% of Vic-taulic’s annual sales during the period from 2010 through 2012.[29] Notice, however, that nothing in the proposed amended complaint so far supports the plausible inference that Victaulic defrauded the government, much less that it did so over ten years. To support that allegation, CFI relies on its so-called “eBay investigation.” And that is where CFI’s claims ultimately fail.
C. Step Two: The “eBay Investigation” and Its Obvious Deficiencies
At this point in our narrative, CFI (i) believes that Victaulic is importing large quantities of foreign-made pipe fittings into the United States, and (ii) suspects that Victaulic is not properly marking those pipe fittings to reflect their countries-of-origin. But how to prove those sus *264 picions? CFI’s answer was to survey the online retailer eBay in an attempt to draw inferences about the broader U.S. market.
To that end, CFI’s president personally spent between one and five hours per day over a period of six months compiling eBay postings for Victaulic pipe fittings.[30] CFI then examined these postings to determine whether they contained photographs of Victaulic products with visible country-of-origin marks.
What was the goal of this investigation? Well, recall that CFI estimates that between 54% to 91% of Victaulic’s pipe fittings were imported from China and Poland between 2010 and 2012, According to CFI, we should therefore expect to see “Made in China” or “Made in Poland” markings on somewhere between 54% and 91% of all Victaulic pipe fittings for sale in the United States—and, by corollary, for sale on eBay.[31] „
That hypothesis, however, assumes, with no basis in alleged fact, that secondhand postings on eBay are representative of all Victaulic products for sale in the United States. It also assumes, again with no basis in alleged fact, that photographs in eBay postings (i) depict the very items being sold rather than stock images or photographs of other inventory, and (ii) depict those items in such a way that foreign country-of-origin markings would be clearly visible. Both of these assumptions are questionable. First, Victaulic claims that “[its] full product line is not available on eBay,” meaning that “[r]esellers on eBay would only have access to small quantities of overstock and/or older, used, salvaged, stolen, or counterfeit products.”[32] Second, CFI’s complaint alleges that U.S.-made products tend to command a higher price than foreign-made products.[33] Resellers on eBay therefore may have a strong incentive to obscure foreign country-of-origin markings. We, of course, cannot credit a defendant’s factual assertions at the motion to dismiss stage—but doing so is different from recognizing that the plausibility of CFI’s allegations depends on multiple unsupported assumptions about how eBay actually functions.
What is fairly clear to this point is that CFI did not actually base its conclusions on a comprehensive analysis of Victaulic pipe fittings for sale on eBay. What CFI did instead was to construct a subsample of a subsample of a subsample. For example:
• CFI began by searching eBay for “Victaulic” in the “new” subset of the “fittings” product category. These searches “typically resulted in about 600 active eBay listings daily.”[34]
• In some postings, the word “Victaulic” appeared in the title, but it was clear that the posting was not actually for a Victaulic pipe fitting. These postings were excluded.[35]
• Some postings were for “old stock.” These were excluded because CFI’s analysis “was intended to examine products of relatively recent manufacture (e.g., from 2005 to the present).” That 2005 number is surprising because CFI’s earlier calculations focus on import figures for the period from 2010 to 2012— to say nothing of the fact that CFI actually alleges a fraudulent scheme going back to 2003.
*265 • At this point, 20% of postings “did not include actual photos of the products for sale.”[36] These, too, were excluded. Eliminating listings without photos, of course, is the same thing as assuming that 100% of the pipe fittings advertised in those listings lacked foreign country-of-origin marks—an assumption that is itself deeply problematic.
After filtering the data this way, CFI identified 221 postings for Victaulic pipe fittings that contained photographs. Of those 221 postings, 29 contained photographs of products marked as being made in the United States; three contained photographs of products with foreign country-of-origin marks; and 189 contained photographs where no country-of-origin marks were apparent.[37] Of the 189 postings in the third group, “there were approximately 40 listings that had limited or unclear photographs, such that it would have been difficult to see country-of-origin markings.”[38]
CFI decided that it wanted more information about the 40 listings with indeterminate photographs. Rather than purchase products from all 40 of them, however, CFI purchased just ten to examine in person. CFI never says whether these products were randomly chosen. Of these, it turned out that one was not a Victaulic product at all, four had no country-of-origin markings, four had U.S. country-of-origin markings, and one item “was packed with a U.S. origin label, but did not appear to have a permanent origin marking.”[39]
If we assume (again, with no basis in alleged fact) that the ten-product sample is representative of all products in the group of 40 postings with indeterminate photographs, then the results of the eBay study looks like this:
Table 1: Results of CFI’s eBay Investigation
*266 [[Image here]]
This is the extent of the evidence of a decade-long scheme to defraud the government. CFI points to the extrapolated “fact” that 169 of the Victaulic products in its 221-item sample—about 75% of the total—lack country-of-origin markings.[40] Recall, too, that CFI asserts that at least 54% of Victaulic products for sale on eBay should be stamped “made in China” or “made in Poland.” CFI therefore contends that “[t]he only reasonable conclusion that can be drawn from [its] analysis is that Victaulic has unlawfully imported huge quantities of unmarked pipe fittings from its foreign manufacturing plants and has then sold those unmarked fittings in the U.S.”[41]
Based on the record before us, here is the entire logical chain supporting CFI’s allegations:
• Step one: Based on import data and information from unnamed sources, 54% to 91% of Victaulic’s annual sales between 2010 and 2012 derived from imports of pipe fittings from China and Poland.
• Step two: We should therefore expect that, in any representative sample of Victaulic’s products for sale in the U.S. market, 54% to 91% of items should bear country-of-origin markings from China and Poland.
• Step three: Assume that Victaulic products available on eBay constitute a perfectly representative sample of Victaulic products for sale in the United States.
• Step four: Assume that photographs on eBay are not stock images but *267 rather accurate depictions of the physical items being sold.
• Step five: Assume that a nonrandom sample of 221 of Victaulic items for sale on eBay is also perfectly representative of Victaulic products sold in the United States.
• Step six: While 40 items out of this 221-item - sample contain unclear photographs, assume that we can rectify that problem with a nonrandom sample of ten items, examined in person.
• Step seven: Extrapolating from these two nonrandom samples, we can conclude that over 75% of Vic-taulie products for sale on eBay, lack country-of-origin marks.
• Step eight: Because we have assumed that eBay is perfectly representative of the U.S. market, we can conclude that 75% of all Victaulic products sold in the United States must lack country-of-origin marks as well.
• Step nine: Therefore, Victaulic has been defrauding the United States government of accrued marking duties since at least 2003.
This chain of inferences simply does not support a plausible allegation of fraud.
I turn first to the relevant legal standard. As we recently explained in Finkelman v. National Football League,[42] the essence of the Supreme Court’s plausibility test under Twombly and Iqbal is that allegations merely consistent with liability are not enough to survive a motion to dismiss.[43] When assessing whether a complaint raises sufficiently plausible allegations, the Supreme Court has instructed us to “draw on [our] judicial experience and common sense.”[44]
My common sense tells me that a plaintiff cannot plausibly allege a ten-year scheme to defraud the government .on the basis of 221 eBay postings. At most, the eBay study provides evidence consistent with fraud.[45] It does not provide any evidence more plausibly suggesting that fraud actually occurred.
The first problem is that CFI surveyed the wrong population. It would have been perfectly acceptable for CFI to draw a random sample from eBay if it was trying to draw inferences about the larger universe of Victaulic products actually sold on eBay. The problem is that CFI wants to use eBay as a proxy for the entire U.S. market for Victaulic pipe fittings. Unfortunately, CFI never sampled that larger population. CFI could have rectified this problem by making factual allegations sufficient to support the plausible inference that eBay serves as an appropriate proxy for the entire U.S. market, but the only allegations to that effect in the complaint *268 are entirely conclusory.[46] This is unsurprising, since there is no reason to believe that eBay—-an e-commerce platform that sells everything from clothing to electronics to collectible coins, sometimes via auction and sometimes via direct person-to-person transactions—looks or functions anything like the broader market for iron and steel pipe fittings.
This brings us to the second problem with the eBay study—the fact that CFI did not take a random sample at all. Thus, even if we were to treat eBay as a viable stand-in for the U.S. market, the eBay study is still fatally flawed because CFI did not take a random sample of Victaulie products for sale on eBay. Instead, it spent weeks building its own curated subset of 221 postings, all the while applying any number of criteria (including the requirement that postings contain photographs) likely to skew its results. This is to say nothing of the fact that CFI’s actual conclusions involve additional extrapolations based on the ten Victaulie products that CFI examined in person. CFI constructed a convenience sample, not a random one, and such a sample “provides no rigorous assurance that the sample will represent the population of interest.”[47]
The District Court raised these very objections when it dismissed CFI’s first complaint.[48] In an effort to respond to these concerns, CFI hired Dr. Abraham J. Wyner, Director of the Undergraduate Program in Statistics at the University of Pennsylvania’s Wharton School, to write a declaration that it attached as an exhibit to the proposed amended complaint. Unfortunately, Dr. Wyner fails to articulate any independent justifications for CFI’s methodology. Instead, his declaration rests entirely on CFI’s own conclusory assumptions about eBay. Here is the key language:
My analysis is based on ... very reasonable and quite conservative assumptions .... I will assume that the slice of the secondary market for Victaulie pipe fittings represented by eBay contains a proportion of imported products at least approximately similar to the proportion of imported products among all U.S. sales and that any significant deviation is caused only by chance.[49]
The sleight of hand here is to assert, •without any basis in alleged fact, that it is “very reasonable” to assume that the universe of products being sold on eBay somehow mirrors the entire U.S. market. Indeed, the entire rhetorical gambit of the Wyner declaration is to repeat CFI’s con-clusory allegations back to the reader in *269 more, technical-sounding terms. A few examples illustrate the point.
First, Dr* Wyner recognizes that the findings from the eBay investigation “could be skewed” if eBay were not representative of the U.S. market, but he says that these fears are “contrary to [CFI’s] actual observations of eBay as a diverse sales outlet with a representative national cross-section of Victaulic pipe fittings, including geographically and by supplier and product variety.”[50] This conclusory language is lifted directly from the proposed amended complaint.[51]
Second, Dr. Wyner acknowledges that the validity of the eBay study depends on the accuracy of photographs in eBay postings, but he downplays that concern because “[a]ccording to [CFI] ... the vast majority of relevant listings had pictures and the vast majority of these pictures provided views of the Victaulic product such that a country-of-origin marking would have been visible had it existed.”[52] In other words: the eBay study is accurate because CFI says it is.
. Third, while Victaulic warns that “eBay sellers may have concealed import markings,” Dr. Wyner tells us that “[t]his is inconsistent with the evidence provided, by [CFI] that only 40 of the 221 items had incomplete or unclear images.”[53] This mode of reasoning is exactly backwards. If the results of a survey are biased, those same results cannot support the reliability of the survey design in the first instance.
Accordingly, Dr. Wyner’s conclusion— that “assuming the validity of [his assumptions], [he] would be more than 99.9% confident that Victaulic is improperly marking a significant portion of its imports”—is profoundly misleading.[54] If I were to assume that the judges of the Third Circuit comprise an accurate cross-section of the U.S. population,' I would then be able to conclude that a startlingly high proportion of the general public has a law degree. But of course, 'it would be frivolous to make that assumption in the first instance. Understood in context, Dr. Wyner’s declaration is little more than a reflecticin of CFI’s own unsupported assumptions about eBay, only dressed up in more persuasive-sounding statistical jargon. For this reason, his declaration completely fails to nudge CFI’s allegations across the plausibility threshold.
Stepping away from the specifics of CFI’s investigation, the significant issue in this case concerns how we think about the plausibility standard when a complaint rests entirely on statistical evidence. In the mine, run of cases, of course, Daubert and the Federal Rules of Evidence will filter out unreliable statistical evidence in due course.[55] But to my mind, ,we act contrary to Twombly and Iqbal when we refuse to ask whether statistical evidence actually supports a plausible inference of wrongdo *270 ing at all, particularly when a complaint rests on statistical evidence alone. In the words of one observer, “[statistical studies are neither magic nor snake oil, and the experts neither sorcerers nor (generally speaking) charlatans. Rather, what legal actors need to do is treat statistical studies critically.”[56] Just so—even at the motion to dismiss stage.
A recent case from the Second Circuit illustrates this point. In Burgis v. New York City Department of Sanitation,[57] the plaintiffs alleged that officials had “discriminated against them and others similarly situated on the basis of their race and/or national origin in the [Department of Sanitation’s] promotional practices.”[58] In support of their Equal Protection claim, they relied exclusively on statistical evidence. The Second Circuit held for the first time that, in a case alleging employment discrimination, “statistics alone may be sufficient” to get past the motion to dismiss stage.[59]
But the Second Circuit also stated that, “to show discriminatory intent ... based on statistics alone, the statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely.”[60] The plaintiffs in Burgis “failed to allege statistics that me[t] the standards articulated above,” in part because their evidence “show[ed] only the raw percentages of White, Black, and Hispanic individuals at each employment level, without providing any detail as to the number of individuals at each level, the qualifications of individuals in the applicant pool and of those hired for each position, or the number of openings at each level.”[61] In the Second Circuit’s view, this was not enough to allege a viable claim.
Burgis demonstrates that numbers alone are not enough to get a litigant past the motion to dismiss stage. Rather, a litigant’s statistical evidence must be reliable enough to raise a plausible inference of wrongdoing. Here, I believe that a basic facility with statistical concepts demonstrate that the plaintiffs eBay study supports no plausible inference at all—let alone one that surpasses the high bar to allege fraud.[62]
The ultimate lesson of Twombly and Iqbal is that a federal lawsuit is not a mechanism to confirm a vague suspicion that fraudulent conduct occurred. Sturdier factual allegations are necessary. The Twom-bly plaintiffs, observing parallel conduct in the marketspace, were awfully concerned about an antitrust conspiracy. Finkelman himself observed higher prices in the resale market for Super Bowl tickets and had “a strong suspicion that [his] ticketfs] would have been cheaper if more tickets had been available for purchase by members of the general public.”[63] CFI browses postings on eBay and has a powerful inkling that Victaulic has been mismarking its products. In all these instances, what is lacking is either some first-person account *271 indicating that unlawful conduct has actually occurred, or at the very least, some other generalized allegation that raises a plausible inference of wrongdoing.
To be fair, there is one moment in the Proposed Amended Complaint when CFI tries to offer a first-person account of fraudulent conduct. Here it is:
One witness, who has worked for many years in the pipe and tube industry, recalls a customer procuring Victaulic pipe fittings that the company represented were 100% U.S. manufactured. This witness observed that at the bottom of one box of Victaulic inventory, a packing list indicated that the products had originated from Poland. None of the Victaulic pipe fittings were marked with any foreign country name, however.[64]
This is CFI’s best evidence: one unnamed witness in an unknown location who,, one time, saw one box of Victaulic pipe fittings that appeared to be mismarked. That single anecdote simply cannot be enough to support plausible allegations of a ten-year scheme to defraud the government. Accordingly, I would affirm the District Court’s denial of CFI’s motion to reopen the judgment on this alternative ground.
II. The Proposed Amended Complaint Also Fails to Satisfy Rule 9(b)
I would also conclude that the proposed amended complaint fails to comply with Rule 9(b). CFI’s pleadings contain “voluminous records detailing the shipments at issue, when they entered the country, the alleged problems with those shipments, and, by operation of law, when liability would have attached.”[65] In the majority’s view, “nothing more is required to give Victaulic adequate notice of the claims raised against it.”[66] I respectfully disagree.
We start with the applicable law. Rule 9(b) requires that “a party must state with particularity the circumstances constituting fraud or mistake.”[67] In Foglia v. Renal Ventures Management, LLC,[68] we explained that two approaches had emerged in the Courts of Appeals regarding how to comply with Rule 9(b) in a False Claims Act suit. Under one approach, “a plaintiff must show ‘representative samples’ of the alleged fraudulent conduct, specifying the time, place, and content of the acts and the identity of the actors.”[69] We adopted a second, more lenient approach, holding that “it is sufficient for a plaintiff to allege ‘particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.’ ”[70] We rejected the stricter alternative because, in our view, it would have required qui tam rela-tors to offer a level of “detail at the pleading stage [that] would be ‘one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.’ ”[71]
Foglia itself was a “close case as to meeting the requirements of Rule 9(b).”[72] Still, we concluded that the plaintiffs alle *272 gations were satisfactory because (i) they “suffice[d] to give [the defendant] notice of the charges against it, as is required by Rule 9(b),” and (ii) “only [the defendant] ha[d] access to the documents that could easily prove the claim one way or another—the full billing records from the time under consideration.”[73]
Our only precedential opinion to have applied Foglia in a subsequent False Claims Act case, United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC,[74] made it clear that Rule 9(b) still has sharper teeth than Rule 8. We said there that, under Rule 9(b), “[a] plaintiff alleging fraud [under the False Claims Act] must ... support its allegations ‘with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.’ ”[75] This is a greater level of detail than that associated with mere notice pleading.
The proposed amended complaint does not satisfy these standards. While it may be true that CFI’s complaint includes “voluminous records detailing the shipments at issue,”[76] it is important to keep in mind that these records detail all of Victaulic’s imports from China and Poland over the period from 2003 through 2012.[77] Based on its flawed eBay study, CFI insists that some unknown portion of those shipments must involve mismarked goods. But CFI fails entirely to tell us which shipments, during which time periods, at which ports, were supposedly unlawful. To suggest that there must be fraud there—somewhere— cannot possibly be enough to satisfy Rule 9(b). Such an approach neither provides us “with reliable indicia that lead to a strong inference that [false] claims were actually submitted,”[78] nor tells us anything specific about “‘the who, what, when, where and how of the events at issue.’”[79] It is, instead, a data dump camouflaged as a set of particularized allegations.[80]
I would therefore affirm the District Court’s termination of this case on this ground as well.
III. Conclusion
The desirability of increasing or decreasing anti-fraud efforts through the mechanism of the False Claims Act is a topic of heated debate.[81] By highlighting *273 the deficiencies in CFI’s allegations, I express no opinion on these matters, whose resolution lies more properly with the executive and legislative branches.
Even so, it is certainly within our province to enforce legal standards as they presently exist. In my view, CFI cannot overcome the plausibility bar of Iqbal and Twombly because its flawed eBay study completely fails to raise a well-supported inference of fraud. CFI cannot satisfy Rule 9(b) because it has failed to allege fraud with particularity. What’s more, I also believe that the District Court was correct to deny CFI’s motion to reopen the judgment on the ground of undue delay.[82]
I therefore respectfully dissent,

. It may be worth noting that CFI appears to be a legal entity created solely for the puipose of bringing this case. See Victaulic Br. at 4 ("CFI does not appear to have any function beyond pursuing this case against Victaulic. CFI was formed in August 2012, which was the same time when CFI began its ‘investigation’ of Victaulic’s activities.” (internal citation omitted)). *260 The government has the right to intervene in order to prosecute a qui tarn suit under the False Claims Act on its own behalf. See 31 U.S.C. § 3730(b)(4). The government declined to do so here. See J.A. 104, ECF No. 3.

. I agree with the majority that the District Court erred by concluding that the False Claims Act does not permit claims on the basis of failure to pay marking duties. Accordingly, I dissent only in part.

. United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co., No. 13-cv-2983, 2014 WL 4375638, at *13-16 (E.D. Pa. Sept. 4, 2014) (relying on Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

. United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co., No. 13-cv-2983, 2015 WL 1608455, at *8-10, 15-19 (E.D. Pa. Apr. 10, 2015).

. Hildebrand v. Allegheny Cty., 757 F.3d 99, 104 (3d Cir. 2014) (quoting Tourscher v. McCullough, 184 F.3d 236, 240 (3d Cir. 1999)).

. Proposed Am. Compl. (J.A. 302-33) ¶ 4.

. See 1 Mod. Sci. Evidence § 5:14 (2015-2016 ed.) ("In surveys that use probability sampling methods, a sampling frame (that is, an explicit list of units in the population) is created. Individual units then are selected by a kind of lottery procedure, and measurements are made on the selected units, which constitute 'the sample.' The objective is to generalize from the sample to the population.”).

. 1 McCormick on Evid. § 208 (7th ed. updated through 2016). To be a bit more technical, "[a] measurement procedure is unbiased if it produces measures that are right on average across repeated applications; that is, if we apply the same measurement procedure to a large number of subjects, sometimes the measure will be too large and sometimes too small, but on average it will yield the right answer." Lee Epstein & Gary King, The Rules of Inference, 69 U. Chi. L. Rev. 1, 92 (2002).

. 1 McCormick on Evid. § 208.

. Epstein & King, 69 U. Chi. L. Rev. at 110.

. Id. atlll.

. Such a sample "provides no rigorous assurance that the sample will represent the population of interest.” Ben K. Grunwald, Suboptimal Social Science and Judicial Precedent, 161 U. Pa. L. Rev. 1409, 1424 (2013).

. See Charles Seife, Proofiness: How You’re Being Fooled by the Numbers 8 (2010) ("[I]f you want to get people to believe something ... just stick a number on it. Even the silliest absurdities seem plausible the moment they are expressed in numerical terms.”).

. Proposed Am. Compl. ¶ 4.

. Id. ¶ 23.

. Id. ¶¶ 23-24.

. IdA 25.

. IdA 26.

. Id. ¶ 28.

. Id. ¶ 30.

. Id. ¶ 31.

. Id.

. IdA 32.

. IdA 37.

. Id. ¶ 40.

. The $152 million figure comes from multiplying 15.2 million pounds by an average price of $10 per pound. The $228 million figure comes from multiplying 15.2 million pounds by an average price of $15 per pound.

. Proposed Am. Compl. ¶ 33.

. The 54% figure comes from dividing $152 million (Victaulic’s estimated annual sales from imports at a price of $10 per pound) by $280 million (the upper-bound of Victaulic’s annual sales). The 91% figure comes from dividing $228 million (Victaulic’s estimated annual sales from imports at a price of $15 per pound) by $250 million (the lower-bound of Victaulic's annual sales).

.When an appeal comes to us at the motion to dismiss stage, “we must accept all well-pled allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.” Brown v. Card Serv. Ctr., 464 F.3d 450, 452 (3d Cir. 2006). The tension here is that "all aspects of a complaint must rest on 'well-pleaded factual allegations’ and not ‘mere conclusoty statements' ”—and some of CFI’s arithmetic seems awfully con-clusory. Finkelman v. Nat’l Football League, 810 F.3d 187, 194 (3d Cir. 2016) (quoting Iqbal, 556 U.S. at 678-79, 129 S.Ct. 1937).

. Proposed Am. Compl. 1Í 65.

. Id. ¶55.

. Victualic Br. at 39.

. See Proposed Am. Compl, ¶¶ 11, 87.

. Id. ¶ 65.

. Id. ¶66.

. Id. ¶ 67.

. Id. ¶¶ 70, 72.

.Id. ¶ 74,

.Id. ¶ 75.

. CFI extrapolates that half of the products from the 40 postings with unclear photographs must bear U.S. markings and half must bear no country-of-origin markings. Id. ¶ 77. This seems to be an error. If we are going to use CFI’s bogus methodology, we should at least follow its logic and conclude that one-tenth of the 40 items at issue were not made by Victaulic.

. Id. ¶ 81.

. 810 F.3d 187 (3d Cir. 2016).

. Id. at 201 (stating that the Twombly plaintiffs "looked around and saw conduct consistent with a conspiracy, but they saw no facts that indicated more plausibly that a conspiracy actually existed”); see also Santiago v. Warminster Twp., 629 F.3d 121, 133 (3d Cir. 2010) (" '[Plossibility’ is no longer the touchstone for pleading sufficiency after Twombly and Iqbal. Plausibility is what matters.”).

. Iqbal, 556 U.S. at 679, 129 S.Ct. 1937.

.I say "evidence consistent with fraud” because, of course, CFI could have ran the exact same flawed study, with the same faulty criteria, and come up with a sample of 221 eBay postings in which a large proportion of postings did depict foreign countiy-of-origin markings. In this sense, the results of the eBay study are "more consistent” with fraud than the alternative. But this is different from concluding that the eBay study actually allows us to draw any meaningful inferences about Victaulic’s behavior.

. CFI claims that eBay is "a reliable eviden-tiary source.” (Proposed Am. Compl. ¶ 64.) But "we have been careful to note that, even at the pleading stage, ‘we need not accept as true unsupported conclusions and unwarranted inferences.' ” Finkelman, 810 F.3d at 202 (quoting Maio v. Aetna, Inc., 221 F.3d 472, 500 (3d Cir. 2000)). Asserting that eBay is a "reliable evidentiary source” from which to draw conclusions about the broader U.S. market is exactly the kind of "unsupported conclusion” we have traditionally rejected.

. Grunwald, 161 U. Pa. L. Rev. at 1424.

. Customs Fraud Investigations, LLC, 2014 WL 4375638, at *15 ("Even if the Court accepts CFI's assertion that eBay listings constitute a reasonable representative sample of the secondary sale market for pipe fittings in the United States, or that an examination of 221 advertisements from eighty-one sellers over a six-month period could provide data from which to draw accurate wider conclusions about millions of pounds of product imported over a. decade, and even assuming that CFI has accurately identified, dated, and examined every Victaulie pipe fitting on eBay, CFI has alleged no facts to show that any of the unmarked pipe fittings on eBay are not, in fact, U.S.-made.”).

. J.A. 359-60 ¶¶ 11-12 (emphasis added),

. Id. at 360-61 ¶ 13.

. See Proposed Am. Compl. ¶ 61 (“eBay is an active and diverse secondary sales outlet for Victaulic products.”); id. ¶ 64 (“The eBay listings identified included a representative national cross-section of Victaulic iron and steel pipe fittings, including, in most cases, product photos, making it a reliable evidentia-ry source.”).

. J.A. 361 ¶ 15 (parentheticals omitted).

. Id. at 363 ¶ 19.

. Id. at 360 ¶ 12.

. See Kannankeril v. Terminix Int’l, Inc., 128 F.3d 802, 806 (3d Cir.1997) ("Under the Federal Rules of Evidence, it is the role of the trial judge to act as a ‘gatekeeper’ to ensure that any and all expert testimony or evidence is not only relevant, but also reliable.” (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993))).

. Edward K. Cheng, Fighting Legal Innumeracy, 17 Green Bag 2d 271, 275 (2014), available at http://www.greenbag.org/vl7n3/vl7n 3_articles_cheng.pdf (last visited Aug. 26, 2016).

. 798 F.3d 63 (2d Cir. 2015), cert. denied, — U.S. -, 136 S.Ct. 1202, 194 L.Ed.2d 183 (2016).

. Id. at 66.

. Id. at 69.

. Id.

. Id. at 70.

. See discussion infra at pages 268-69.

. Finkelman, 810 F.3d at 201.

. Proposed Am. Compl. ¶ 83,

. Majority Op. Typescript at 258.

. Id. at 25.

. Fed. R. Civ. P. 9(b).

. 754 F.3d 153 (3d Cir. 2014).

. Id. at 155.

. Id. at 156 (quoting United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)).

. Id. (quoting Grubbs, 565 F.3d at 190).

.Id. at 158.

. Id. (punctuation modified).

. 812 F.3d 294 (3d Cir. 2016).

. Id. at 307 (quoting In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002)).

. Majority Op. Typescript at 258.

. A line-by-line printout of these imports takes up 36 pages of the record. See J.A. 154-89.

. Foglia, 754 F.3d at 156 (internal quotation marks omitted).

. Majestic Blue Fisheries, LLC, 812 F.3d at 307 (internal quotation marks omitted).

. This becomes immediately apparent once we step away from the False Claims Act and consider Rule 9(b) more generally. We have held, for example, that a claim under the Securities Act triggers Rule 9(b) when it “sound[s] in fraud.” In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 270 (3d Cir. 2006). Would we conclude that a plaintiff alleges securities fraud with particularity by attaching ten years of prospectus statements and financial reports to a complaint and telling us, "There must be some fraudulent statements in there somewhere"? I highly doubt it,

.See, e.g., Sean Elameto, Guarding the Guardians: Accountability in Qui Tam Litigation Under the Civil False Claims Act, 41 Pub. Cont. LJ. 813, 823 & nn. 77-80 (2012) (noting that Congress has recently considered bills that would relax Rule 9(b) in the context of False Claim Act suits).

. During the oral argument on Victaulic's motion to dismiss, the District Court told CFI outright that its complaint was deficient. See J.A. 195:5-13 (”[Y]ou needed something, sir, because your complaint is just too barebones. I mean, honestly, I’ll listen to you, but, you know, if you state these, even if they’re facts, they’re conclusory kinds of facts that really under Twombly and Iqbal really don't carry the day.” (scrivener’s errors corrected)).
Despite this admonition, over seven.months passed without CFI filing an amended complaint. Even then, after the District Court granted Victaulic’s motion to dismiss, CFI let another four weeks go by before filing a motion to reopen the judgment. And then, instead of offering new factual allegations, its proposed amended complaint was almost entirely an amalgamation of CFI’s original complaint and the allegations contained in its earlier witness declaration. The District Court concluded—rightly—that CFI was engaging in dilatory tactics that independently merited denying CFI’s motion to reopen the judgment.