# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 16, 2011      Decided January 17, 2012
Reissued January 27, 2012

No. 10-7138

RICHARD DOMINGUEZ, ON BEHALF OF HIMSELF AND ALL
OTHERS SIMILARLY SITUATED,
APPELLANT

v.

UAL CORPORATION AND UNITED AIR LINES, INC.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-00418)

*Roy A. Katriel* argued the cause and filed the briefs for appellant.

*John Roberti* argued the cause for appellees. With him on the briefs was *Richard J. Favretto*.

Before: HENDERSON, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Richard Dominguez brought this antitrust class action lawsuit against United Air Lines, Inc. and its parent company UAL Corporation, challenging their policy prohibiting ticket resale. The district court granted summary judgment on the merits for the airline after deciding that it need not address whether Dominguez had standing to bring his claims. Because a federal court is not free to ignore standing, we took up the issue and conclude that there is none. The district court should have dismissed Dominguez's suit for lack of jurisdiction because his claimed injury is too speculative.

I

In an effort to maximize profits, United, like many other airlines, employs a pricing strategy that charges different prices for the same seats based on a customer's willingness to abide certain conditions. For example, a customer can buy a cheaper ticket that has restrictions such as advance purchase, or a more expensive ticket without such limitations. This strategy will not work, however, if the buyer of a discounted ticket with a 21-day advance purchase requirement could sell that ticket just before the date of the flight to someone who would otherwise have to purchase a more expensive ticket. United's "No Transfer Policy," which prohibits the re-sale of its tickets, is therefore a central feature of its pricing strategy.

On April 18, 2006, Dominguez purchased a package ticket for three United flights: from Dulles International Airport in Washington, D.C., to Oakland International Airport on June 27, 2006; from San Francisco International Airport to Seattle-Tacoma International Airport on July 3, 2006; and from Seattle back to Dulles on July 8, 2006. Dominguez claims that United's No Transfer Policy kept him from buying his tickets at lower prices in violation of sections 1 and 2 of

the Sherman Act, 15 U.S.C. §§ 1, 2, as well as the common law prohibition of unjust enrichment. The district court concluded that the policy was lawful and granted summary judgment for United. Dominguez now appeals. He challenges United's policy only as applied to non-stop air travel between metropolitan Washington, D.C., and the San Francisco Bay area, which United concedes is the relevant market for purposes of summary judgment. Only Dominguez's flight to Oakland was in that market.

## II

Acknowledging that "Dominguez's claims of injury are indeed speculative," the district court nevertheless concluded that there was "no need to address standing" because it "ha[d] concluded as a matter of law that no antitrust violation ha[d] occurred." *Dominguez v. UAL Corp.*, No. 07-0418, at 6 n.4 (D.D.C. Sept. 28, 2010). In taking this approach, the district court erred. Article III of the Constitution strictly limits the federal judicial power to resolving "Cases" and "Controversies." U.S. CONST. art. III, § 2. This limitation is no mere formality: it "defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." *Allen v. Wright*, 468 U.S. 737, 750 (1983). The requirement that a plaintiff have standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). As such, standing is a necessary "predicate to any exercise of our jurisdiction," *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc), and if it is lacking, then "the dispute is not a proper case or controversy, [and] the courts have no business deciding it, or expounding the law in the course of doing so," *DaimlerChrylser Corp. v. Cuno*, 547 U.S. 332, 341 (2006). *See also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,

94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)) (internal quotation marks omitted)). Thus, every federal court has a "special obligation to satisfy itself" of its own jurisdiction before addressing the merits of any dispute. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).

That the merits of a particular claim may be clear is no reason to avoid the constitutionally required inquiry into this limit on our jurisdiction. It is no doubt tempting for courts to bypass jurisdictional issues and address the merits of disputes, especially where the merits question may be easily answered, but standing is a check that reinforces the constitutional principle that some disputes are beyond our authority to resolve. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("[Standing] is founded in concern about the proper — and properly limited — role of the courts in a democratic society."). The Supreme Court has criticized courts for assuming jurisdiction as the district court did in this case, stating emphatically that "[w]e decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers." *Steel Co.*, 523 U.S. at 94; *see also Allen*, 468 U.S. at 751 (explaining that the "case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government" and that "[t]he Art. III doctrine that requires a litigant to have 'standing' is perhaps the most important of these doctrines").

The district court treated this bedrock constitutional principle as if it were something trivial. Although this error

"might be thought to warrant a remand, so that the district court could consider the matter in the first instance, the Supreme Court has instructed courts of appeals to decide for themselves whether the party seeking judicial review has standing, even if the issue was not decided below." *Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 82 (D.C. Cir. 1991) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990)). Thus, we are required to comb the record to determine whether Dominguez has standing.

III

Every plaintiff in federal court bears the burden of establishing the three elements that make up the "irreducible constitutional minimum" of Article III standing: injury-in-fact, causation, and redressability. *See Lujan*, 504 U.S. at 560-61. At summary judgment, Dominguez's burden is to show that a reasonable juror could find he has standing. *See Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008). To satisfy this burden, Dominguez cannot rest on "mere allegations" but must establish each element of standing by putting forth "specific facts." *Lujan*, 504 U.S. at 561 (quoting FED. R. CIV. P. 56(e)). We will take Dominguez's facts as true and draw all reasonable inferences in his favor. *See Geleta v. Gray*, 645 F.3d 408, 410 (D.C. Cir. 2011).

Dominguez claims that United's No Transfer Policy prevented him from buying a less expensive ticket for his Dulles-to-Oakland flight by foreclosing the emergence of a secondary market of ticket resellers. But, for the reasons set forth below, we conclude that no reasonable juror could find that Dominguez was overcharged as a result of the policy. The gaps in the evidence he presented and the nature of the ticket he bought make Dominguez's injury "speculative at

best." *See Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663, 670 (D.C. Cir. 2007).

To show the likely emergence of a secondary market, Dominguez relies primarily on surveys conducted by Dr. Bruce Isaacson that measured consumer interest if purchasers of non-refundable United tickets for travel in the relevant market were allowed to sell them to others. Dr. Isaacson concluded that "a high percentage of respondents would consider using a feature allowing them to legally sell or give away airline tickets they are unable to use." Pl.'s Opp'n to Defs.' Mot. Summ. J. Ex. 2, at 1. Dominguez also relies on the testimony of Frank Levy, co-founder of FairAir.com (FairAir), which briefly resold airline tickets in an online secondary market in 2001. FairAir shut down after only six weeks of operation, when the airlines it was working with decided not to allow ticket transfer due to concerns that a secondary market would undermine their pricing strategies. According to Levy, a secondary market similar to the one Dominguez envisions can exist, and Levy testified that he would be interested in relaunching FairAir. In response, United asserts that the prediction that a secondary market would emerge is simply too speculative. *See Fla. Audubon Soc'y*, 94 F.3d at 670. Not only does the prediction rest on the gauzy finding that consumers "would consider" buying and selling transferable airline tickets, but it runs up against the hard reality that no secondary market of the type Dominguez envisions currently exists even though other airlines allow ticket resale.

But we need not resolve this dispute because Dr. Isaacson's survey cannot show that any secondary market would have led to a lower price than what Dominguez paid for his flight from Dulles to Oakland. Dr. Isaacson admitted that his survey did not take into account costs associated with

running a secondary market. For example, at the time Dominguez bought his ticket in 2006, airlines allowing ticket transfer charged name-change fees of up to $50. One of Dominguez's experts admitted that now such fees are typically between $25 and $100, and another explained that a $150 fee is not unreasonable. Indeed, United currently charges a $150 fee for changes to an itinerary, but Dr. Isaacson's survey assumed, without explanation, that no similar charge would have been assessed for name changes. Given the practices of other airlines and United's own itinerary-change fees, it would be unreasonable to infer that United would not have charged such fees. Moreover, the amount of that fee would be completely within United's control. United could reasonably charge a fee that would reduce the possibility of secondary market transactions by making them economically unviable. As Dr. Isaacson admitted in his deposition, United's ability to charge a fee for name changes decreases the likelihood that prices in a secondary market would be low enough to place pressure on United to reduce its prices.

In addition, Dr. Isaacson's survey did not take into account costs such as the approximately $495,000 it would cost United to change its reservation system to allow for name changes on previously issued tickets or what it would cost to educate consumers about the secondary market. His survey also overlooked that the creator of the secondary market would charge fees, just as eBay and similar websites do now. FairAir itself charged a $10 flat fee plus a 6% commission (with a $25 minimum) to process transfers. All of these costs, uncounted by Dr. Isaacson, would have increased ticket prices in a secondary market. The analysis on which Dominguez relies cannot be used to conclude that he would have benefited from a secondary market because it fails to present

an accurate picture of the prices that would be negotiated in that market.

Dominguez faces another problem in basing his claim of injury on Dr. Isaacson's survey: the survey does not even speak to the relevant question of whether secondary market prices would have been lower than what Dominguez paid to fly from Dulles to Oakland. The survey compares ticket prices for flights between Dulles and Oakland with and without the No Transfer Policy and concludes they would be less expensive without the policy because a secondary market would emerge. But Dominguez's flight from Dulles to Oakland was less expensive than the flights Dr. Isaacson considered because he received a package discount by buying three flights together.[*] In short, the survey claims secondary market prices would be lower than prices without a package discount, but Dominguez did not pay that price. Even if Isaacson's survey shows that some United customers were injured by the No Transfer Policy — and for the reasons already discussed that seems uncertain at best — it would still be speculative to think the survey shows Dominguez was one of them.

At a more general level, Dominguez's data showing lower secondary market prices assumes that United would continue to offer the same types of tickets that it does now. But without the No Transfer Policy, United could not enforce the restrictions it currently imposes on its discounted tickets and would need to alter its pricing strategy, which may very

---

[*] United's Director of Domestic Pricing explained that in 2009 a package ticket on Dominguez's route was $728 as opposed to a total of $832 for three one-way tickets. No data was provided on the comparative prices at the time of Dominguez's purchase, but these numbers illustrate the uncontroverted point that under United's pricing Dominguez received a package discount.

well result in higher average ticket prices if it stopped offering discounts. It piles speculation atop speculation to assume that United would continue to offer discounted tickets if it could no longer price discriminate. *Cf. Adams v. Pan Am. World Airways, Inc.*, 828 F.2d 24, 30 (D.C. Cir. 1987) ("[In antitrust cases,] injury turns on the impact of the alleged wrong on the relevant market itself, so that the fact finders cannot take a market structure as given."). Based on the evidence presented, no reasonable juror could find that Dominguez was overcharged as a result of the No Transfer Policy, and therefore he lacks standing to challenge the policy in federal court.

Finally, we address an argument that Dominguez pressed in his supplemental brief on standing and again at oral argument. Relying on a line of antitrust cases starting with *Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946), Dominguez argued that injury-in-fact in antitrust cases should be inferred when the defendant's wrongdoing has prevented more precise proof of the fact of injury. But *Bigelow* was not a standing case. Instead, it addressed whether the plaintiff's evidence was precise enough to support a jury award and established the settled principle that it is improper to insist upon "precise proof" of the amount of damages when "the defendant by his own wrong has prevented a more precise computation." *Id.* at 264. Later cases clarify that *Bigelow*'s principle applies only to the showing needed to support a damage award, not to the constitutional requirement that the plaintiff show the fact of injury. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 570 (Powell, J., dissenting) (highlighting the difference between the "fact of antitrust injury" and "the evidence [required] to prove the amount of damages"); *In re Visa Check/Mastermoney Antitrust Litigation*, 192 F.R.D. 68, 82-83 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001) ("The *fact* of injury . . .

should not be confused with the *extent* of injury (as reflected by the amount of damages) which may not be amenable to establishment with great precision.").

## IV

For the foregoing reasons, the judgment of the district court is vacated, and the case is remanded with directions that the complaint be dismissed for lack of jurisdiction.

*So ordered.*