**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-4087
_____

JOSH FINKELMAN,
on behalf of himself and the Putative class,

Appellant

v.

NATIONAL FOOTBALL LEAGUE; NFL VENTURES,
L.P.; NFL PROPERTIES, L.L.C.; NFL VENTURES, INC.;
NFL ENTERPRISES, L.L.C.
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-14-cv-00096)
District Judge:  Honorable Peter G. Sheridan
_____

Argued July 12, 2017

Before: SMITH, *Chief Judge*, FUENTES, *Circuit Judge*, and
STARK,[*] *Chief District Judge*

---

[*] Honorable Leonard P. Stark, Chief Judge of the United
States District Court for the District of Delaware, sitting by
designation.

(Opinion Filed: December 15, 2017)

Greg M. Kohn, Esq.
Bruce H. Nagel, Esq. **[ARGUED]**
Nagel Rice
103 Eisenhower Parkway
Roseland, NJ 07068

*Counsel for Appellant*


Karen A. Confoy, Esq.
Fox Rothschild
997 Lenox Drive
Princeton Pike Corporate Center, Building 3
Lawrenceville, NJ 08648

William Feldman, Esq.
Jonathan D. Pressment, Esq. **[ARGUED]**
Haynes & Boone
30 Rockefeller Center
26th Floor
New York, NY 10112

*Counsel for Appellees*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

Plaintiff Josh Finkelman had the once-in-a-lifetime opportunity to buy tickets to Super Bowl XLVIII held in his home state of New Jersey in February 2014. However, the National Football League ("NFL") withheld almost all of these tickets—99%—from the general public for league insiders, offering the remaining 1% to lucky winners of a lottery that all could enter. To get his tickets, Finkelman turned to the secondary market, purchasing two tickets with a face value of $800 each for $2000 each. One month before the Super Bowl, he filed suit, alleging that the NFL's ticket distribution violated New Jersey law. Specifically, Finkelman claims that the NFL's withholding of more than 5% of the available tickets for the Super Bowl violated the New Jersey Ticket Law. He has now had two opportunities before our Court to show that he has Article III standing to pursue this claim. In our first decision on this subject, we found that he did not. He has since added claims about how the NFL's secondary ticket market functioned and how the NFL's actions raised ticket prices on the secondary market. The District Court found that these additional allegations remained insufficient to allege Finkelman's standing. We disagree. Based on the plausible economic facts pleaded in Finkelman's amended complaint, we conclude that Finkelman has standing and we therefore have subject matter jurisdiction over this case. We defer action on the merits of this appeal pending decision by the Supreme Court of New Jersey on the pending petition for certification of questions of state law.

## I.      Background

3

On February 2, 2014, Super Bowl XLVIII was held in New Jersey, at MetLife Stadium in East Rutherford. Finkelman alleges that the NFL has a policy of withholding almost all Super Bowl tickets—99%—from the general public. Of these 99%, he alleges that 75% of the withheld tickets are split among NFL teams, with 5% going to the host team, 17.5% going to each team playing in the Super Bowl, and 35% going to the remaining NFL teams. The remaining 25% of tickets are withheld for companies, broadcast networks, media sponsors, the host committee, and other "league insiders." The 1% of tickets for public purchase are sold through a lottery system. In order to acquire a ticket in the lottery, a person has to enter by the deadline, be selected as a winner, and choose to actually purchase a ticket.

Finkelman alleges that he purchased two tickets on the secondary market. Although these tickets had a face value of $800 each, he purchased them for $2,000 per ticket. He did not enter the lottery to seek to win the 1% of tickets offered at face value to lucky members of the public.

In January 2014, Plaintiff Finkelman filed a putative class action in the District of New Jersey against the NFL and various affiliated entities, alleging that the Defendants violated New Jersey's Ticket Law, N.J. Stat. Ann. § 56:8-35.1, by

withholding more than 5% of tickets to the Super Bowl.[1] This law, part of New Jersey's Consumer Fraud Act ("CFA"),[2] reads:

> It shall be an unlawful practice for a person, who has access to tickets to an event prior to the tickets' release for sale to the general public, to withhold those tickets from sale to the general public in an amount exceeding 5% of all available seating for the event.

## II. Procedural History

### A. First District Court Decision

In the first round of this case, Defendants moved to dismiss Finkelman's first amended complaint under Rule

---

[1] Originally, this suit also included a second plaintiff, Ben Hoch-Parker, who alleged that he wanted to buy Super Bowl tickets but did not because of the high prices on the secondary market. The District Court found that he had no Article III standing to sue, and we affirmed that dismissal. *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 195 (3d Cir. 2016). Thus, he is no longer in the case. Plaintiff originally also brought an unjust enrichment claim, but the operative complaint no longer includes this claim.

[2] The CFA permits private plaintiffs to sue any person who violates the Act and causes them ascertainable damages. N.J. Stat. Ann. § 56:8-19.

12(b)(6) and the District Court granted the motion.[3] Without addressing Article III standing, the District Court reasoned that Defendants never "withheld" tickets within the meaning of the Ticket Law because they did not keep tickets in their custody. Instead, they "allocated" 100% of all available tickets by giving 99% of them to NFL teams and other League insiders and holding a lottery to sell the remaining 1% of tickets. The District Court also concluded that Finkelman failed to plead causation under the CFA because he never entered the ticket lottery.

### B. First Decision of Our Court

On appeal, we concluded that Finkelman did not establish Article III standing.[4] In doing so, we considered two theories Finkelman pleaded to prove standing. First, we considered whether Finkelman had standing because the NFL's ticket withholding prevented him from buying a ticket at face value. We found that he had not shown a causal connection between the NFL's actions and the injury framed in this way, because Finkelman failed to enter the lottery to buy face value tickets. So, any harm that Finkelman suffered was properly attributed not to the NFL, but rather to his own decision not to enter the ticket lottery. Thus, Finkelman failed to allege standing on this theory.[5]

---

[3] *Finkelman v. Nat'l Football League*, D.C. No. 3:14-cv-00096, Dkt. 54; App. Vol III 281. *See also* App. Vol. III 233-80 (transcript of oral argument and opinion).

[4] *Finkelman*, 810 F.3d at 197. We omit a discussion of Hoch-Parker's standing since he is no longer in the case.

[5] *Id.* at 197-99.

Second, we considered whether Finkelman had standing because the NFL's ticket withholding policy increased the cost of the tickets that he purchased *on the secondary market*. Under this theory, his damages would not be the difference between the ticket's face value and the price that he paid, but instead the difference between what he paid on the secondary market and what the tickets would have cost on the secondary market had the NFL not withheld tickets in alleged violation of the Ticket Law.

However, we found that Finkelman had not pleaded specific enough allegations to demonstrate that the NFL's withholding actually did increase the price he paid for tickets on the secondary market. We noted the basic economic theory that limiting supply increases price. Thus, one could assume that the NFL's restriction on the availability of Super Bowl tickets to the public increased the price that Finkelman paid for his tickets. Unfortunately for Finkelman, this mere assumption was not enough to prove his standing. Under the scheme Finkelman pleaded, it was also possible that NFL insiders that had obtained non-public tickets were willing to resell to the public, so that supply was not artificially limited and the price inflated in the secondary market. Moreover, we posited that if some of those NFL insiders did not have to pay for their tickets originally, they might be willing to resell their tickets on the secondary market for less than a member of the public who paid face value would have done. So, the NFL's withholding could have even lowered ticket prices on the secondary market.

We explained that to establish Article III standard based on this theory, under the familiar *Twombly-Iqbal* standard,[6] Finkelman needed to plead facts specific enough to allege that the NFL's ticket withholding caused the price he paid for tickets on the secondary market to rise. Because we could only speculate as to the effects the NFL withholding had on secondary ticket prices, the allegations were insufficient to establish Article III standing. We remanded to allow the District Court to exercise its discretion as to whether Finkelman should be granted leave to amend.[7]

**C. Second Amended Complaint**

The District Court granted Finkelman's motion to amend the complaint,[8] and Finkelman filed a Second Amended Complaint.[9] In it, Finkelman pursued only the second theory of standing, mapped out in our first opinion. To do so, Finkelman added facts alleged by Daniel Rascher, an economist who specializes in sports and ticketing on the workings of secondary ticket markets in events like the Super Bowl.[10] Rascher concludes that the NFL's withholding resulted in fewer tickets being available on the secondary market and higher prices for those tickets that were available.

---

[6] *Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007).

[7] *Finkelman*, 810 F.3d at 199-203.

[8] *Finkelman*, D.C. No. 3:14-cv-00096, Dkt. 82; App. Vol. III 294.

[9] *Finkelman*, D.C. No. 3:14-cv-00096, Dkt. 83; App. Vol. III 295-336.

[10] These factual allegations can be found at SAC ¶¶ 40-43, App. Vol. III at 308-17.

In support of this conclusion, he explains that under the NFL's current system, NFL insiders sell their tickets to a concentrated group of brokers, who in turn charge more for tickets on the secondary market. Without the NFL withholding, he posits that there would be more fan-to-fan direct sales of tickets, cutting out more brokers and allowing for lower prices. He explains that NFL insiders are more likely to use brokers to resell their tickets than fans would be, either because the insiders are not technically allowed to sell their tickets or because they seek to avoid unwanted publicity from the sales. Rascher also states that the NFL's initial withholding adds an additional layer in the supply chain (insider-to-broker sales), which results in higher prices for customers. He cites research by himself and other economists in support of these allegations.

### D. Second District Court Opinion

Defendants again moved to dismiss,[11] and the District Court granted the motion.[12] The District Court found that Finkelman had not proved standing because he did not enter the NFL's ticket lottery and because the additional facts Finkelman alleged regarding causation were too conclusory. Furthermore, in the alternative, the District Court reasoned that even if Finkelman did have standing, Finkelman had not properly alleged a violation of the Ticket Law, reiterating its interpretation of the Ticket Law from its first decision.

---

[11] *Finkelman*, D.C. No. 3:14-cv-00096, Dkt. 92; App. Vol. III 337-38.

[12] *Finkelman*, D.C. No. 3:14-cv-00096, Dkt. 104; App. Vol. I 3-18.

## III. Jurisdiction and Standard of Review

This is a diversity suit over which the District Court had jurisdiction pursuant to the Class Action Fairness Act.[13] This Court has jurisdiction over the final judgment of the District Court under 28 U.S.C. § 1291.

The Court's review of a decision dismissing a complaint, as well as over questions of statutory interpretation, is plenary.[14]

## IV. Discussion

Finkelman appeals the District Court's judgment which followed our remand, arguing that he has properly pleaded Article III standing and has properly pleaded a claim under the Ticket Law to overcome Defendants' Rule 12(b)(6) motion to dismiss.

---

[13] *See* 28 U.S.C. § 1332(d)(2)(A) ("The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant").

[14] *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 601 (3d Cir. 2015); *United States v. Berberena*, 694 F.3d 514, 519 n.7 (3d Cir. 2012).

Because "[w]ithout jurisdiction the court cannot proceed at all in any cause,"[15] we first consider whether Finkelman has alleged facts sufficient to establish Article III standing at this stage in the litigation. To establish Article III standing, a plaintiff must allege "(1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."[16]

First, to state an injury-in-fact, a plaintiff must allege "the invasion of a concrete and particularized legally protected interest resulting in harm that is actual or imminent, not conjectural or hypothetical."[17] In turn, "[a] harm is particularized if it affects the plaintiff in a personal and individual way. It is concrete if it is *de facto*; that is, it must actually exist rather than being only abstract."[18] "While it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms."[19]

To show causation, the alleged injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before

---

[15] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

[16] *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272 (3d Cir. 2016) (internal citations omitted).

[17] *Id.* (internal citations and quotations omitted).

[18] *Id.* (internal citations, quotations, and alterations omitted).

[19] *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005).

the court."[20] Causation in this context is akin to 'but-for' causation in tort and "may be satisfied even where the conduct in question might not have been a proximate cause of the harm."[21] To satisfy it, "an indirect causal relationship will suffice, provided that there is a fairly traceable connection between the alleged injury-in-fact and the alleged conduct of the defendant."[22]

To show redressability, a plaintiff must show that it is "likely, as opposed to merely speculative, that the alleged injury will be redressed by a favorable decision."[23]

The plaintiff bears the burden of proving standing.[24] "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation."[25] Thus, at this stage of the

---

[20] *Finkelman*, 810 F.3d at 193 (internal citation omitted).

[21] *Id.* (internal citations and quotations omitted).

[22] *Id.* at 193-94 (internal citations and quotations omitted).

[23] *Id.* at 194 (internal citations and quotations omitted).

[24] *Danvers*, 432 F.3d at 291.

[25] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

litigation, we use the same standard we apply when assessing a motion to dismiss for failure to state a claim.[26]

To do so, "[f]irst, we take note of the elements a plaintiff must plead to state a claim—here, the three elements of Article III standing. Second, we eliminate from consideration any allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Third, where there are well-pleaded factual allegations, we assume their veracity and then determine whether they plausibly establish the prerequisites of standing."[27] If Finkelman cannot establish standing, we must dismiss for lack of subject matter jurisdiction.[28]

---

[26] *Finkelman*, 810 F.3d at 194 (internal citation omitted). Plaintiff argues that his pleadings do not have to meet the standard of *Twombly* and *Iqbal* in order to allege standing at this phase. We need not reach this question—we continue to apply the same standard that we did in the first opinion in this case. *See Finkelman*, 810 F.3d at 194 n.5 ("Some of our sister circuits have questioned how well the 'plausibility' standard of *Iqbal* and *Twombly* maps onto standing doctrine . . . . Without wading too deeply into this particular thicket, we are content to say that, even when reviewing only the bare allegations of a complaint, *Iqbal* and *Twombly* teach that standing cannot rest on mere "legal conclusions" or "naked assertions.").

[27] *Id.* (internal citations, quotations, and alterations omitted).

[28] *Id.* at 195 (citing *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 362 (3d Cir. 2015) ("[T]he 'cases or controversies' requirement is satisfied so long as a class representative has standing.")).

13

In finding that Finkelman had not properly alleged standing in our initial opinion, we compared this case to *Dominguez v. UAL Corp.*, in which the D.C. Circuit reversed the district court's grant of summary judgment in favor of the defendant and found that the plaintiff lacked standing to sue.[29] We noted that in that case, "[t]he plaintiff . . . sued United Air Lines under the federal antitrust laws, asserting that United's prohibition on reselling airplane tickets deprived him of a secondary market in which he might have been able to purchase tickets for less money than he paid United."[30] To allege that United's prohibition had caused him an injury-in-fact, the plaintiff had offered testimony from an expert who had surveyed United customers and concluded that "a high percentage of respondents would consider using a feature that allowed them to legally sell or give away airline tickets they are unable to use."[31] The D.C. Circuit found this insufficient to show standing because the plaintiff's expert "did not take into account costs associated with running a secondary market" such as the costs of changing United's reservation system, the possible introduction of new, seller-imposed fees, and other factors that might influence prices in a hypothetical resale market.[32] Thus, like Finkelman in his earlier complaint, the plaintiff could only speculate as to whether an end to United's prohibition would have led to lower ticket prices.

Here, however, in his amended complaint, Finkelman has offered specific factual allegations above and beyond those described in *Dominguez*. Finkelman did not just allege that

---

[29] 666 F.3d 1359 (D.C. Cir. 2012).

[30] *Finkelman*, 810 F.3d at 201.

[31] *Dominguez*, 666 F.3d at 1363.

[32] *Id.* at 1363-64.

prices would be lower on the secondary market were it not for the NFL's withholding. Instead, Finkelman alleged a causal chain justifying *why* the NFL's withholding set into motion a series of events that ultimately raised prices on the secondary market. Specifically, Finkelman alleged that the insiders to whom the NFL presently provides tickets are more likely to re-sell those tickets through third-party brokers to keep those sales anonymous, and those brokers in turn are more likely to charge higher prices. But if more tickets were made available to fans initially, fans would be more likely than the NFL insiders are to sell through direct fan-to-fan sales, and the prices would likely be lower.[33]

Given Finkelman's additional factual allegations, a different D.C. Circuit case, *Osborn v. Visa Inc.*,[34] is more instructive. In that case, users and operators of non-bank Automated Teller Machines (ATMs) sued Visa, MasterCard, and affiliated banks alleging anticompetitive behavior in pricing ATM access fees. In their complaint, the plaintiffs alleged that in the absence of the defendants' anticompetitive behavior, ATM operators would charge MasterCard and Visa customers higher rates than non-MasterCard and Visa customers. This, in turn, would drive customers to pressure their banks to offer cards using networks other than MasterCard or Visa, which would make this market more competitive and result in more choice of networks, lower fees for consumers, and greater profits for non-bank ATM operators.[35] In granting the defendants' motion to dismiss, the

---

[33] SAC ¶ 40, App. Vol. III 312-14.
[34] 797 F.3d 1057, 1063 (D.C. Cir. 2015).
[35] *Id.* at 1063.

D.C. District Court found that the plaintiff's allegations constituted an "attenuated, speculative chain of events[ ] that relies on numerous independent actors" and dismissed the complaint.[36]

On appeal, the D.C. Circuit reversed. It held that "the District Court was demanding proof of an economic theory that was not required in a complaint."[37] The Court noted:

> At the pleadings stage, a court must accept as true all material allegations of the complaint, an obligation that we have recognized might appear to be in tension with the Court's further admonition that an allegation of injury or of redressability that is too speculative will not suffice to invoke the federal judicial power. But this ostensible tension is reconciled by distinguishing allegations of facts, either historical or otherwise demonstrable, from allegations that are really predictions. Thus, when considering any chain of allegations for standing purposes, we may reject as overly speculative . . . those types of allegations that are not normally susceptible of labelling as "true" or "false."[38]

---

[36] *Id.* (quoting *Nat'l ATM Council, Inc. v. Visa Inc.*, 7 F. Supp. 3d 51, 60 (D.D.C. 2013)). *See also id.* at 1064 ("The District Court reasoned that the protracted chain of causation alleged by Plaintiffs fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury.") (internal citations and quotations omitted)).

[37] *Id.* at 1063.

[38] *Id.* at 1064 (internal citations and quotations omitted).

The D.C. Circuit found that the plaintiffs' theory was "susceptible to proof at trial."[39] It noted that the complaint contained "factual details" supporting the "alleged causal link" between the defendants' behavior and plaintiffs' economic harm.[40] The Court acknowledged that the plaintiffs' allegations did "rely on certain economic assumptions about supply and demand" but noted that "these sorts of assumptions are provable at trial."[41] Distinguishing *Dominguez* and other cases decided on summary judgment, the Court noted that the plaintiffs had no obligation to offer evidence of their theory here, as "[a] Rule 12(b)(1) motion . . . is not the occasion for evaluating the empirical accuracy of an economic theory."[42] The Court concluded that "[b]ecause the economic facts alleged by the Plaintiffs are specific, plausible, and susceptible to proof at trial, they pass muster for standing purposes at the pleadings stage."[43]

In this case, too, Finkelman has offered economic facts that are specific, plausible, and susceptible to proof at trial. Defendants may be correct that Finkelman will not be able to prove that the 2014 Superbowl secondary ticket market worked as he claims. Defendants remain free to bring a factual challenge to jurisdiction disputing just that. But Finkelman is not required to prove his economic theory in his complaint,

---

[39] *Id.* at 1065.

[40] *Id.*

[41] *Id*. *See also id.* ("Indeed, allegations of economic harm 'based on standard principles of "supply and demand"' are 'routinely credited by courts in a variety of contexts.'") (quoting *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993).

[42] *Id.* at 1065-66.

[43] *Id.* at 1066.

and, at this stage in the litigation, Finkelman has alleged sufficient factual allegations to show that Defendants' withholding raised the price that he paid for tickets on the secondary market. Thus, Finkelman has Article III standing.

## V.    Conclusion

We reverse the District Court and find that we have subject matter jurisdiction over this matter. We defer action on the merits of this appeal pending a decision by the Supreme Court of New Jersey on a petition for certification of questions of state law. We shall retain jurisdiction over the appeal pending resolution of the certification.